**NOT FOR PUBLICATION**

In the

# United States Court of Appeals

## For the Eleventh Circuit

————————————

No. 24-10567

————————————

BRITNEY DENTON,

NYABI STEVENS,

DEIDRICK DANSBY,

FAYERACHEL PETERSON,

ALEXANDER HARRIS, et al.,

*Plaintiffs-Appellants,*

*versus*

BOARD OF GOVERNORS FOR THE STATE
UNIVERSITY SYSTEM OF FLORIDA,
STATE OF FLORIDA,
STATE OF FLORIDA, COMMISSIONER
OF EDUCATION,
RAYMOND RODRIGUES,
BRIAN LAMB, et al.,

*Defendants-Appellees,*

MARSHALL M CRISER, III, et al.,

*Defendants.*

———————————

Appeals from the United States District Court
for the Northern District of Florida
D.C. Docket No. 4:22-cv-00341-RH-MAF

———————————

Before ROSENBAUM, BRANCH, and KIDD, Circuit Judges.

PER CURIAM:

This case asks whether the administrators of Florida's only historically Black college or university ("HBCU") violated federal law through (1) chronically underfunding the university and (2) offering fewer unique, high-demand programs at the HBCU, versus its historically white peer institutions. That HBCU is Florida Agricultural and Mechanical University ("FAMU"). Several current FAMU students brought this putative class action, alleging that the Florida State University System's treatment of FAMU violated Title VI, the Fourteenth Amendment's Equal Protection Clause, and *United States v. Fordice*, 505 U.S. 717 (1992).

When the school administrators moved to dismiss, the district court denied the motion on standing grounds, but the court granted the motion for failure to state a claim. We agree with the district court's thoughtful standing analysis. But we conclude that the court misapplied the Rule 12(b)(6) standard of review—crediting the administrators' version of events over the students' well-pled allegations, and looking beyond the four corners of the complaint to disputed extrinsic materials. Of course, nothing in this

opinion reflects any view on the underlying merits of the students' claims. But as alleged, those claims should've survived the motion-to-dismiss stage.

For those reasons, we affirm in part, reverse in part, and remand for further proceedings.

## I.          BACKGROUND

Current FAMU students Britney Denton, Nyabi Stevens, Deidrick Dansby, Fayerachel Peterson, Alexander Harris, and Jacari Hester (collectively, the "Students") alleged that Defendants violated federal law by maintaining a segregated system of higher education at FAMU, Florida's only HBCU. The Students, who are Black, brought this putative class action on behalf of "all Black students at FAMU at any time during the 2021/2022 school year through the date of class certification."

Defendants include the Board of Governors of the State University System of Florida ("Board"), along with individual members of the Board sued in their official capacities; as well as Raymond Rodrigues, in his official capacity as the Chancellor of the State University System of Florida; Manny Diaz, Jr., in his official capacity as the Commissioner of Education of the State of Florida and as a Board member; and the State of Florida (collectively, the "Administrators").

The Students brought three claims against the Administrators. First, they brought a *Fordice* claim under Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d, *et seq*. ("Count I"). Second,

they brought a *Fordice* claim under 42 U.S.C. § 1983 and the Equal Protection Clause ("Count II"). And third, they brought a racial-discrimination claim under Section 1983 and the Fourteenth Amendment ("Count III"). They brought Count I against the Board and State of Florida, and they brought Counts II and III against the individual Board members. The Students seek declaratory and injunctive relief but not damages.

The Students point to several policies or practices in support of their claims.

First, they allege that the Administrators have engaged in a policy or pattern of chronically underfunding (or underresourcing) FAMU, relative to the state's "historically white institutions" ("HWIs"). These historically white universities include the University of Florida ("UF") and Florida State University ("FSU"). The Students allege underfunding/underresourcing in three main ways. The first is a general underfunding claim, which posits that the Administrators have failed to equitably fund FAMU relative to Florida's HWIs, in terms of total appropriations and per-student allocations. The second is an alleged chronic failure to match the federal land-grant funds to FAMU as compared to Florida's other land-grant school, UF. And the third is a claim that the Administrators' use and implementation of Florida's Performance Based Funding Model ("PBFM") has resulted in a disproportionate distribution of funds to FAMU versus Florida's HWIs, for reasons having to do with the state's historical de jure system of segregated higher education.

The Students allege that this underfunding/underresourcing has resulted in fewer total dollars going to FAMU, fewer per-student dollars, lower faculty salaries, less funding for campus facilities and infrastructure, and an overall chronic underinvestment in the university. They argue that the underfunding is traceable to Florida's de jure system of segregated higher education; that it has continuing segregative effects; and that sound remedies exist that the Administrators can implement to redress the issue. We refer to this bucket of claims as the "underfunding/underresourcing" allegations.

Second, the Students allege that the Administrators have engaged in a policy or pattern of (a) offering relatively fewer "unique, high-demand" programs at FAMU (and taking away the unique programming it used to have), and (b) simultaneously unnecessarily duplicating core programs of FAMU at nearby white institutions. For example, the Students point to the Administrators' decisions to duplicate many of FAMU's programs at the geographically proximate FSU, to merge previous FAMU programs with FSU as newly "joint" programs (e.g., the new Joint College of Engineering), and to momentarily eliminate FAMU's law school (which has since been reestablished). We refer to these as the "curricular-policy" allegations.

As with the underfunding allegations, the Students contend that the curricular-policy allegations point to policies or practices that are traceable to Florida's de jure system of segregation. They argue that the Administrators' curricular-policy decisions have had

enduring segregative effects, as seen through FAMU's continued identity as "the 'Black School.'"  The Students point to Florida's universities' racial statistics to argue that it's reasonable to infer that these policies have impacted students' free choices on where to go to college.

And so they assert that Florida's continuing use of the challenged curricular policies and the underfunding-related policies means it hasn't fulfilled its obligation to remedy the effects of de jure segregation.  In the Students' view, these policies are part and parcel of a historic pattern of chronically underfunding, and treating inequitably, Florida's only HBCU: FAMU.  So, they argue, the state has failed to dismantle its prior system of dual segregation in Florida's State University System.

The district court found these allegations unavailing.  After concluding that the Students had standing to bring their claims, the court found the Students failed to state a claim under *Fordice*, Title VI, or the Fourteenth Amendment.  It distinguished the Students' claims as distinct from those the Supreme Court confronted about Mississippi's state university system in *Fordice*.  The HWIs the Students identified in their complaint, the district court said, are "not" "traditionally white," but rather "traditionally diverse."  And the court opined that FAMU's disproportionately Black student population reflected solely the advantages of attending an HBCU for some Black students—rather than reflecting a failure to dismantle de jure segregation.

As for the land-grant-underfunding allegations, the district court reasoned that Florida isn't required to distribute funds equitably among FAMU and UF, its two land-grant schools. So it didn't find that the land-grant-underfunding decisions were traceable to de jure segregation. On the PBFM-related underfunding allegations, the district court concluded that though the formula might have a racially disparate impact, the Students hadn't adequately pled that Florida adopted that policy for discriminatory reasons. And the district court determined that the Students hadn't adequately alleged any curricular policies traceable to de jure segregation, either. Instead, the court reasoned that duplication made sense as Florida's population grew, and the court faulted the Students for failing to identify a particular program they wanted that FAMU didn't have.

So the district court dismissed the Students' claims.

On appeal, the Students argue that the district court erred in dismissing their claims on Rule 12(b)(6) grounds because it misapplied the standard of review. Basically, they assert that the district court credited the Administrators' version of the facts over their own well-pled allegations—which is inappropriate at the motion-to-dismiss stage. For the reasons we'll explain, we agree.

## II.        DISCUSSION

First, we determine that the Students have standing to bring their claims. Second, we conclude that they adequately pled their claims under *Fordice*, Title VI, and the Equal Protection Clause.

We begin by discussing the standard of review.  Then we explain why the Students have standing.  And finally, we show why the complaint survives a Rule 12(b)(6) motion.

### A.  Standard of Review

When a district court dismisses a complaint for lack of standing, we review that decision de novo.  *Glynn Env't Coal., Inc. v. Sea Island Acquisition, LLC*, 26 F.4th 1235, 1240 (11th Cir. 2022).  In doing so, we accept the allegations in the complaint as true, and we draw all reasonable inferences in the plaintiffs' favor.  *Id.*

We also review de novo a dismissal for failure to state a claim.  *Robinson v. Liberty Mut. Ins. Co.*, 958 F.3d 1137, 1139 (11th Cir. 2020).  Again, we accept the allegations in the complaint as true and make all reasonable inferences in the plaintiffs' favor.  *See id.*  Generally, claims are facially plausible when the allegations "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  But "[f]actual allegations that are 'merely consistent with a defendant's liability' fall short of being facially plausible."  *Chaparro v. Carnival Corp.*, 693 F.3d 1333, 1337 (11th Cir. 2012) (quoting *Iqbal*, 556 U.S. at 678).  In other words, "[t]he plausibility standard 'calls for enough fact[s] to raise a reasonable expectation that discovery will reveal evidence' of the defendant's liability."  *Id.* (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 556 (2007)).  But it is not a *probability* standard.  *See Smith & Wesson Brands, Inc. v. Estados Unidos Mexicanos*, 145 S. Ct. 1556, 1565 (2025) ("'Plausibly' does not mean 'probably,' but 'it asks for more than a sheer

possibility that a defendant has acted unlawfully.'" (quoting *Iqbal*, 556 U.S. at 678)).

"And when determining whether the complaint crosses 'the line between possibility and plausibility of entitlement to relief,' 'courts may infer from the factual allegations in the complaint obvious alternative explanations, which suggest lawful conduct rather than the unlawful conduct the plaintiff would ask the court to infer.'" *Doe v. Samford Univ.*, 29 F.4th 675, 686 (11th Cir. 2022) (first quoting *Twombly*, 550 U.S. at 557, and then quoting *Am. Dental Ass'n v. Cigna Corp.*, 605 F.3d 1283, 1290 (11th Cir. 2010)) (internal citations omitted). We've further clarified that "facial plausibility is determined by asking whether the facts alleged 'allow[] the court to draw the *reasonable* inference that the defendant is liable.'" *Id.* at 687 (quoting *Iqbal*, 556 U.S. at 678) (emphasis added by *Doe* Court).

Next, we turn to the application.

### B. The Students have standing.

Because the Students adequately pled an injury, causation, and redressability, the Students have standing to bring their claims.

To satisfy Article III's case-or-controversy requirement, plaintiffs must have standing to sue. *Florence Endocrine Clinic, PLLC v. Arriva Med., LLC*, 858 F.3d 1362, 1365 (11th Cir. 2017). Plaintiffs must establish three elements: (1) an "injury in fact," which is (2) "fairly traceable" to the defendant's challenged conduct, and (3) "likely to be redressed by a favorable judicial decision." *Id.* (quoting *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016)).

The Administrators argue that the Students fail on all three prongs.  We disagree.  We review each prong in turn.

### 1.    The Students adequately pled injuries in fact.

The Students adequately pled that the Administrators' conduct injured them.

Generally, an "injury in fact" is "an invasion of a legally protected interest which is (a) concrete and particularized; and (b) "actual or imminent, not 'conjectural' or 'hypothetical.'" *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992) (internal citations omitted).  An injury is "particularized" if it "affect[s] the plaintiff in a personal and individual way."  *Trichell v. Midland Credit Mgmt., Inc.*, 964 F.3d 990, 1000 (11th Cir. 2020) (quoting *Lujan*, 504 U.S. at 560 n.1) (emphasis and internal quotation marks omitted).  In other words, we've said that satisfying the injury-in-fact requirement means that "a plaintiff may show that he 'has sustained or is immediately in danger of sustaining some direct injury.'"  *Corbett v. Transportation Sec. Admin.*, 930 F.3d 1225, 1232 (11th Cir. 2019) (quoting *Lynch v. Baxley*, 744 F.2d 1452, 1456 (11th Cir. 1984)).  An injury that is merely "[a]bstract . . . is not enough."  *Id.* (quoting *Lyons*, 461 U.S. at 101) (internal quotation marks omitted).

Though injuries must be "concrete" to establish standing, they need not be tangible.  *See TransUnion LLC v. Ramirez*, 594 U.S. 413, 425 (2021).  Concrete injuries may include "traditional tangible harms, such as physical harms and monetary harms."  *Id.*  But they may also include "intangible harms," especially "injuries with a close relationship to harms traditionally recognized as providing a

basis for lawsuits in American courts," such as "reputational harms, disclosure of private information, and intrusion upon seclusion." *Id.* (internal citations omitted).

It's also not necessary for harms to be direct. "Even without any direct harm, a plaintiff can establish an injury in fact by showing that a statutory violation created a 'risk of real harm.'" *Muransky v. Godiva Chocolatier, Inc.*, 979 F.3d 917, 927 (11th Cir. 2020) (quoting *Spokeo*, 578 U.S. at 341). And future injuries can establish standing, "so long as [the plaintiff] 'is immediately in danger of sustaining some direct injury' as a result of the challenged . . . conduct and the injury or threat of injury is both 'real and immediate,' not 'conjectural' or 'hypothetical.'" *Id.* at 1232–33 (quoting *Lyons*, 461 U.S. at 101–02); *see also Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990) ("A threatened injury must be 'certainly impending' to constitute injury in fact." (citation omitted)). Plus, a "material risk of future harm can satisfy the concrete-harm requirement in the context of a claim for injunctive relief to prevent the harm from occurring, at least so long as the risk of harm is sufficiently imminent and substantial." *TransUnion*, 594 U.S. at 415 (citing *Spokeo*, 578 U.S. at 341–42).

"At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we 'presum[e] that general allegations embrace those specific facts that are necessary to support the claim.'" *Lujan*, 504 U.S. at 561 (citation omitted); *see also Moody v. Holman*, 887 F.3d 1281, 1286 (11th Cir. 2018) (similar). And for putative class actions,

"only one named plaintiff for each proposed class needs to have standing for a particular claim to advance." *Wilding v. DNC Servs. Corp.*, 941 F.3d 1116, 1124 (11th Cir. 2019).

Finally, the Supreme Court has told us that students' "diminished ability to receive an education in a racially integrated school—is, beyond any doubt, not only judicially cognizable but, as shown by cases from *Brown v. Board of Education*, 347 U.S. 483 (1954), to *Bob Jones University v. United States*, 461 U.S. 574 (1983), one of the most serious injuries recognized in our legal system." *Allen v. Wright*, 468 U.S. 737, 756 (1984), *abrogated on other grounds by Lexmark Intern., Inc. v. Static Control Components, Inc.*, 572 U.S. 118 (2014).

In this case, the Students adequately pled injuries in fact. The class of people who've allegedly suffered an injury here consists of current FAMU students, who have suffered (and will continue to suffer) diminished educational opportunities because of the alleged underresourcing, underfunding, and challenged curricular policies concerning FAMU. *See id.*; *see also Lujan*, 504 U.S. at 560.

The Students clearly fall into this class. As alleged, their diminished opportunities come from an absence of unique, high-demand programs at FAMU, leading to less racial diversity; per-student underfunding, relative to UF, to the tune of nearly $5,000 per student; unnecessarily duplicated programs, leading to less diversity among the student body; FAMU's underdeveloped facilities, campus, and infrastructure; lower levels of faculty pay because of

the alleged underfunding, which is important for attracting both students and research grants; fewer resources for students and faculty more generally; and specifically, "less money to support academic research programs, student support, faculty capacity and badly needed technology and infrastructure upgrades."[1]

These injuries are concrete and particularized. *Lujan*, 504 U.S. at 560. And the Students (as current FAMU students suffering these conditions) clearly have "a personal stake in the outcome" of this case. *Corbett*, 930 F.3d at 1232. The mere fact that these "concrete and specific" injuries are "widely shared" doesn't mean they aren't legally cognizable injuries in fact. *See Fed. Election Comm'n v. Akins*, 524 U.S. 11, 24–25 (1998). It just means—as with any putative class action—that the injury is common to a class of prospective plaintiffs.

The Administrators advance two counterarguments here. Neither is compelling.

First, they contend that any "lack of racial diversity at FAMU" isn't a cognizable injury for standing purposes; and that even if it is, the Students didn't allege that white students *don't* attend FAMU because of underfunding or curricular deficiencies.

---

[1] One example of this is the alleged downsizing of FAMU's College of Agriculture, which coincided with "giving UF, the traditionally-white land-grant institution, primary control over many of the research, education, and extension services in the State." The Students allege that this action "limited the growth and expansion of agricultural and land-grant related programs at FAMU," expanding them instead at the HWI UF, at FAMU's expense.

The Administrators assert that white students may decline to attend FAMU for many other reasons. For instance, they say, disproportionately more Black students may choose to attend FAMU in part *because* of its identity as an HBCU—which might not be relatively as big of a draw, in and of itself, for some non-Black students.

But the Students don't allege that lack of diversity is itself an injury. To the contrary, they claim that the relative lack of racial diversity at FAMU "is both a cause and [a] consequence of segregation's vestiges, but it is not Plaintiffs' injury." So this counterargument misunderstands the Students' claims.

Second, the Administrators argue that the Students failed to allege that they were *personally* denied opportunities because of Florida's funding decisions. This is wrong. As current FAMU students, the Students are each among the intended beneficiaries of FAMU's funding and programming. So according to their allegations, they've been personally denied equal educational opportunities. Once again, that these injuries are "widely shared" doesn't mean they aren't injuries. *See Akins*, 524 U.S. at 24–25.

In sum, at this stage of the case, the Students have satisfied standing's injury prong.

### 2. The Administrators caused the Students' injuries.

The Students have also satisfied the causation prong at the pleading stage.

To establish causation, "the named plaintiffs must allege that their injuries are 'connect[ed] with the conduct of which [they]

complain.'" *Wilding v. DNC Servs. Corp.*, 941 F.3d 1116, 1125 (11th Cir. 2019) (quoting *Trump v. Hawaii*, 585 U.S. 667, 697–98 (2018)). The injury must be "fairly traceable to the defendant's conduct," and proximate cause is not required. *Lexmark*, 572 U.S. at 134 n.6. In other words, plaintiffs don't have to allege "that the defendant's actions are the very last step in the chain of causation," as "even harms that flow indirectly from the action in question can be said to be 'fairly traceable' to that action for standing purposes." *Wilding*, 941 F.3d at 1125–26 (cleaned up) (citations and quotation marks omitted).

Here, the Students' injuries—their diminished educational opportunities at FAMU—are connected with, and fairly traceable to, the Administrators' conduct. *See id.* It doesn't matter if intervening events occurred, or if these harms flowed only "indirectly." *See id.* The Administrators allegedly failed to dismantle the segregative effects of de jure segregation, by failing to adequately resource and fund FAMU (especially relative to Florida's HWIs) and by failing to modify FAMU's curricular offerings to make the school relatively more attractive.

In terms of causation, the Administrators are the proper defendants here. To recap, they consist of Florida, Florida's Commissioner of Education, the Board, and various Board members sued in their official capacities. The Board was created "to govern the State's public universities," and it is responsible for managing each state university and "avoiding wasteful duplication." It is also responsible for "[a]ccounting for [the] expenditure of funds

appropriated by the Legislature for the State University System as provided by law"; submitting budget appropriations requests and adopting strategic plans for each university; and withholding funding, as needed, in ensuring universities comply with the law. It's the various board members' job to investigate noncompliance with the law among schools in the system, to determine allocations of PBFM funding, and to run the Board's Budget and Finance Committee and Facilities Committee, among others. And as alleged, the Administrators are all "recipients of federal financial assistance" and responsible for controlling and disbursing those funds, for which the Students (as current FAMU students) are the "intended beneficiaries[.]" So the Students' injuries are fairly traceable to the Administrators' conduct. *See id.*

The Administrators counter, once again, by pointing to the racial-diversity issue. They contend that the Students haven't alleged that white students choose not to attend FAMU because of Florida's curricular offerings, programming, or funding policies. They argue that some white students' decisions, in picking colleges, may be driven by factors besides Florida's funding and curricular decisions. But as we've explained, this argument does not respond to the Students' claims. The Students aren't asserting a racial-diversity injury per se. Instead, they challenge the policies and practices that the Administrators have implemented—which, in turn, have allegedly adversely affected their educational opportunities as current FAMU students. Those injuries are traceable to the Administrators' conduct.

So the Students meet the causation prong, too.

### 3.  The Students' injuries are redressable.

The Students also meet the third standing requirement: redressability.

To prevail, the Students must show only that there is "'a substantial likelihood' of redressability." *Wilding*, 941 F.3d at 1126–27 (quoting *Duke Power Co. v. Env't Study Grp.*, 438 U.S. 59, 79 (1978)).  It is substantially likely that if the Administrators increased the funding or curricular offerings at FAMU, the injuries the Students point to—having lesser educational opportunities—would be redressed.  In other words, it is substantially likely that an injunction ordering the Administrators to increase the funding, resources, or curricular offerings at FAMU would bring FAMU in line with the mandates of *Fordice*, Title VI, and the Fourteenth Amendment.

Once more, the Administrators focus on the racial-diversity issue in response.  They contend that even if FAMU expanded its programs or received more funds, that wouldn't necessarily mean more white students would apply or gain admission.  They point again to the other reasons Florida's students may select non-FAMU schools, arguing that we shouldn't look to third parties' conduct in assessing standing.

This argument might be persuasive if the Students' alleged injury was a lack of racial diversity.[2]  But it isn't.  Rather, the claim

---

[2] But even so, *Fordice* and *Knight* suggest that remedying the vestiges of segregation *could* increase schools' racial diversity.  In *Fordice*, the Court observed

18                     Opinion of the Court                     24-10567

is that the Administrators have mishandled the federal funding that they receive. As alleged, the Administrators have the power to direct, control, and disburse those funds. And their decisions to do so, the Students say, have reduced the Students' available educational opportunities. So the Administrators are capable of redressing the Students' injuries on the underfunding allegations.

As for the curricular-offerings allegations, those injuries are redressable, too. Florida law provides that the Board must avoid "wasteful" program duplication, account for funding expenditures, and approve, review, and terminate universities' degree programs as necessary. *See* FLA. CONST. art. IX, § 7(d); Fla. Stat. § 1001.705(2). So, the Students argue, an injunction ordering the Administrators to comply with Title VI and the Fourteenth Amendment would redress the Students' injuries. And the Students point to *Fordice* and *Knight*, both of which rejected the "freedom-of-choice" argument when it comes to the racial-diversity issue. In other words, they urge, the State is obligated to "take the necessary steps to ensure that [students'] choice [of universities] now is truly free." *Fordice*, 505 U.S. at 743.

---

that even though "college attendance is by choice and not by assignment," that "does not mean that a race-neutral admissions policy," for example, would "cure[] the constitutional violation . . . ." 505 U.S. at 729. Similarly, as we said in *Knight*, policies that are vestiges of de jure segregation may result in "disproportionate numbers of whites . . . [being] discourag[ed] from choosing to attend [HBCUs]," because some of them "*can* satisfy their curricular desires at HWIs, and *cannot* satisfy them at" HBCUs like FAMU. *See* 14 F.3d at 1541 (emphases in original).

24-10567                Opinion of the Court                19

We agree.  We think the Students have shown that, for standing purposes, "'a substantial likelihood' of redressability" exists. *Wilding*, 941 F.3d at 1126–27

Because the Students' allegations satisfy all three prongs, the Students have standing to bring their *Fordice*, Title VI, and Equal Protection claims.

### C.  The Students adequately pled a *Fordice* claim.

We conclude that the Students adequately pled a *Fordice* claim.  Because we are the first federal appellate court to address the pleading standard for *Fordice* claims, we first discuss what these plaintiffs must plead to survive a Rule 12(b)(6) motion to dismiss.  Then we apply that standard to the Students' allegations.

### 1.  *Fordice*'s Pleading Standard

Two cases primarily guide us in discerning what plaintiffs must allege to adequately plead a *Fordice* claim: (1) *Fordice* itself, and (2) *Knight v. State of Alabama*, 14 F.3d 1534 (11th Cir. 1994).  Still, both *Fordice* and *Knight* articulated the legal standard for a *Fordice* claim well after the motion-to-dismiss stage, after trials took place on the merits of the plaintiffs' claims.[3]

---

[3] To underscore the record-heavy nature of *Fordice* claims, it's worth noting that the district court in *Fordice* heard from seventy-one witnesses and admitted over 50,000 pages of exhibits.  505 U.S. at 725.  Similarly, in *Knight*, two-hundred witness testified, and there were "hundreds of thousands of pages of exhibits," resulting in a 360-page opinion from the district court.  14 F.3d at 1539.

20                    Opinion of the Court                    24-10567

Like this case, *Fordice* involved claims brought under Title VI and the Equal Protection Clause. *See* 505 U.S. at 722–24. The plaintiffs sued the Mississippi governor, among others, for alleged discrimination in the state university system. *Id*. At the time, Mississippi had five "historically white universities" and three "historically black" ones, which remained nearly all-white or all-Black, respectively. *See id*. at 724–25, 733–34, 740. So the *Fordice* plaintiffs sued, alleging that Mississippi had maintained and failed to dismantle the racially segregative effects of its prior system of de jure segregation in higher education. *Id*. at 723–24.

The lower courts found no violations of federal law. They concluded that the defendants were trying to dismantle the former de jure system of segregated higher education and that the court shouldn't attempt to restrict students' free choice or enforce "racial balanc[ing]." *Id*. at 726–27 (citation omitted).

But the Supreme Court vacated and remanded. It reasoned that states violate the Fourteenth Amendment when they fail to abide by their "affirmative duty to dismantle [their] prior dual university system." *Id*. at 727–28. The Court disagreed with the lower courts' reasoning that "the adoption and implementation of race-neutral policies alone suffice to demonstrate that the State has completely abandoned its prior dual system." *Id*. at 729. Put simply, free choice plus race-neutral policies doesn't cure constitutional violations. *Id*. And in any case, far more than race-neutral admissions policies alone shape student choices. *Id*. So merely having

race-neutral admissions policies couldn't insulate the defendants from liability.  *Id.*

The *Fordice* Court set forth the law as follows.  "If policies traceable to the de jure system are still in force and have discriminatory effects, those policies . . . must be reformed to the extent practicable and consistent with sound educational practices."  *Id.* (italics removed).  Or more specifically,

> If the State [1] perpetuates policies and practices traceable to its prior system [2] that continue to have segregative effects—whether by influencing student enrollment decisions or by fostering segregation in other facets of the university system—and [3] such policies are without sound educational justification and can be practicably eliminated, the State has not satisfied its burden of proving that it has dismantled its prior system.

*Id.* at 731.

As we discuss in greater detail soon enough, this statement seems to imply three requirements to make out a *Fordice* claim: (1) the state must perpetuate a policy or practice "traceable to its prior system" of de jure segregation (what we'll call the "traceability prong"), (2) that policy or practice must "continue to have segregative effects" (the "continuing-effects prong"), and (3) the policy must be "without sound educational justification" and capable of being "practicably eliminated" (the "redressability prong").

As the Court explained, these kinds of problematic policies violate the Equal Protection Clause "even [if] the State has

abolished" de jure segregation "and has established racially neutral policies not animated by a discriminatory purpose." *Id.* at 731–73. Plus, the mere fact that the state may be able to point to a "midpassage justification for perpetuating a policy enacted originally to discriminate against black students does not make the present [policy] any less constitutionally suspect." *See id.* at 734.

And plaintiffs don't always have to show discriminatory intent to establish a constitutional violation under *Fordice*. *Id.* at 733 n.8. Rather, if the plaintiff alleges that the state has "perpetuat[ed] . . . policies traceable to the prior de jure segregative regime which have continuing discriminatory effects," then the plaintiff "need not show such discriminatory intent[.]" *Id.* (italics removed). But if the plaintiff identifies "present policies that *do not* have such historical antecedents," then they do have to show a "discriminatory purpose." *Id.* (emphasis added).

As for the related Title VI claim, the *Fordice* Court stated that "the reach of Title VI's protection extends no further than the Fourteenth Amendment." *Id.* at 732, n.7; *accord Sandoval v. Hagan*, 197 F.3d 484, 507 n.24 (11th Cir. 1999), *rev'd sub nom. Alexander v. Sandoval*, 532 U.S. 275 (2001). This makes sense, because "discrimination that violates the Equal Protection Clause of the Fourteenth Amendment committed by an institution that accepts federal funds also constitutes a violation of Title VI." *Gratz v. Bollinger*, 539 U.S. 244, 276 n.23 (2003) (citing, *inter alia*, *Sandoval*, 532 U.S. at 281, and *Fordice*, 505 U.S. at 732, n.7).

So that's the law as the Supreme Court articulated it in *Fordice*.

Next, the Court applied it. It found that "several surviving aspects of Mississippi's prior dual system" were "constitutionally suspect; for even though such policies may be race neutral on their face, they substantially restrict a person's choice of which institution to enter, and they contribute to the racial identifiability of the eight public universities." 505 U.S. at 733. In considering whether the state had sufficiently dismantled its prior dual system, the Court assessed the practices and policies the plaintiffs had pointed to *in combination* with one another, rather than in isolation. *See id.* at 741. The Court concluded that Mississippi had to either "justify these policies or eliminate them." *Id.* at 733. So it remanded the case for further proceedings. *Id.* at 743.

Next, we look at *Knight v. Alabama*—the only other case (besides this one) that our Court has handled addressing a *Fordice* claim—for guidance in discerning the elements of a *Fordice* claim. The *Knight* plaintiffs alleged that Alabama violated Title VI by allocating resources inequitably among its public universities and failing to remedy the vestiges of de jure segregation. 14 F.3d at 1538. In considering the issue, we, of course, discussed the *Fordice* standard.

As we explained, *Fordice* sets forth "a three-step analysis" for assessing these claims. *Id.* at 1540.

Step one asks "whether any particular policy that has been challenged as segregative is 'traceable' to decisions that were made

or practices that were instituted in the past for segregative reasons, thus rendering it a vestige of segregation." *Id.* This "burden of proof lies with the [plaintiff]." *Id.* at 1540–41. In other words, once a court determines "that a particular policy was originally adopted for discriminatory reasons, the *Fordice* test inquires whether the current policy is 'traceable' to the original tainted policy, or is 'rooted' or has its 'antecedents' in that original policy." *Id.* at 1550. We emphasized that *Fordice* "expressly held that an otherwise legitimate interim justification for perpetuation of a policy is insufficient to break the causal chain." *Id.*

If the plaintiff carries her burden of making that showing, we move onto step two. Now, "the burden of proof falls upon the *State*, and not the aggrieved plaintiffs, to establish that it has dismantled its prior de jure segregated system.'" *Id.* at 1541 (quoting *Fordice*, 505 U.S. at 739) (emphasis in original and italics removed). "The state may carry this burden in one of two ways." *Id.* First, it can show that the challenged policy doesn't have any segregative effects today—which requires that courts "consider the effect of the policy as it operates *in combination* with any other challenged policies."[4] *Id.* (emphasis added). Or second, the state can show that "it

---

[4] Policies with segregative effects may include those that influence students' enrollment decisions, by "inhibit[ing] 'free choice' by students as to university attendance." *Id.* at 1541. These may include either "policies that have the effect of discouraging or preventing blacks from attending HWIs" (like "more stringent admissions requirements for HWIs than for HBIs [i.e., historically Black institutions]"), or "policies that discourage whites from seeking to attend HBIs" (like "duplication of programs at HBIs and HWIs in the same geographic area; the assignment to HBIs of institutional missions that restrict

simply is not possible" to abolish or modify the challenged policy.[5] *Id.* We were emphatic that, at step two, "the burden of proof lies" with the state and not the plaintiffs. *See id.* at 1546; *id.* at 1552 (same).

If the state fails to make this showing, we then move onto step three. *Fordice* requires the state to adopt, "from among the full range of practicable and educationally sound alternatives to the challenged policy, the one that would achieve the greatest possible reduction in the identified segregative effects." *Id.* at 1541. So at the third step, courts examine "the practicability and educational

---

them to programs of instruction that cannot effectively attract whites; and the failure to fund HBIs comparably to HWIs or to locate high-prestige programs at HBIs"). *Id.* But again, the segregative-effects inquiry requires determining whether a policy, "alone or in combination with other policies, continue[s] to have segregative effects on student choice . . . ." *Id.* at 1546; *see also id.* at 1550 (stating that, to affirm on the basis that there were no continuing segregative effects, "we would, at a minimum, have to conclude that all three types of continuing segregative effects pointed out by plaintiffs, as well as other combined effects, are, in fact, unfounded").

[5] Here, we drew from *Fordice*'s mandate that schools must reform their policies or practices "to the extent practicable and consistent with sound educational practices." *Id.* at 1541 (quoting *Fordice*, 505 U.S. at 729). So the state can maintain the practice or policy if "the state can show that there are no less segregative alternatives which are practicable and educationally sound . . . ." *Id.* But "the state's burden" here "is a heavy one[,] and 'the circumstances in which a State may maintain a policy or practice traceable to de jure segregation that has segregative effects are narrow.'" *Id.* (quoting *Fordice*, 505 U.S. at 744 (O'Connor, J., concurring)) (italics removed).

soundness of possible alternatives or modifications to a challenged policy[.]" *Id.*

But the mere fact that a policy is educationally sound is not enough. "Under *Fordice,* a state can be required to change even educationally sound practices where they have been found to be vestiges of segregation with continuing segregative effects." *Id.* at 1546. Indeed, if the state fails to adopt such an alternative policy, then "it remains in violation of the Fourteenth Amendment." *Id.* at 1541 (quoting *Fordice,* 505 U.S. at 727). "Only where there are no alternative remedies that are practicable *and* educationally sound is the state defendant relieved of its obligation to remedy the vestiges' effects." *Id.* at 1546 (emphasis added).

And like the showing at step two, we repeatedly made clear that the step-three showing is "*an affirmative duty borne by the state,* [so] the onus is not on the plaintiffs to propose the remedy options to be considered." *Id.* at 1541 (emphasis added); *accord id.* at 1546 (stating that the "burden of proof lies" with the state in showing that there are no "practicable and educationally sound policies that would reduce or dismantle the segregative effects"); *id.* at 1552.

We then went on to apply this three-step burden-shifting framework. *See id.* at 1544–53. We ultimately vacated in part and remanded, *id.* at 1557, concluding the plaintiffs had established some of their claims, yet affirming the district court's denial of others, *see id.* at 1553.

*Fordice* and *Knight* tell us a few things about the pleading standard. First, because step one is the plaintiff's burden, it's clear

that the Students must allege that the policies or practices they challenge are "'traceable' to decisions that [the Administrators] made or practices that [they] instituted in the past for segregative reasons, thus rendering [the policy or practice] a vestige of segregation." *See Knight*, 14 F.3d at 1540. Second, steps two and three are ultimately the state's burden. *Id.* at 1541, 1546. So it's not immediately clear what the plaintiffs have to show, if anything, to preemptively rebut the state's required showings at the motion-to-dismiss stage. But here, we don't have to decide that issue, because even if we did require the plaintiffs to preemptively rebut the state's showing on the continuing-effects and redressability prongs,[6] the Students' allegations would adequately do so here.

To explain why, we group the Students' challenged policies or practices into two buckets.

The first consists of FAMU's alleged underfunding and underresourcing. This includes the Students' allegations about underfunding as a general matter, as well as specifically in terms of the per-student allocations and use of the PBFM. It also includes

---

[6] That said, both our Court and the Supreme Court have been clear that the state bears the "burden of proof" on steps two and three. *Id.* at 1546, 1552; *see also Fordice*, 505 U.S. at 727–28, 731. But it would be strange to impose an evidence-based burden-shifting framework at the pleading stage, before discovery has even begun. *See, e.g., Hittle v. City of Stockton, California*, 145 S. Ct. 759, 761 (2025) (Thomas, J., dissenting from the denial of certiorari) (describing some of the challenges in applying *McDonnell Douglas*'s evidence-based burden-shifting framework even at summary judgment (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)).

their claims about the state's underinvestment in FAMU's facilities, campus, and infrastructure.

The second bucket consists of FAMU's curricular policies. This includes its alleged lack of unique, high-demand programs,[7] and the alleged unnecessary duplication of programs between FAMU and nearby historically white institutions.

Now onto the analysis.

### 2. Underfunding/Underresourcing Claims

The Students adequately pled their underfunding and underresourcing claims. Their allegations plausibly support the traceability, continuing-effects, and redressability prongs of a *Fordice* claim.

First, traceability. The Students adequately pled that the challenged underfunding/underresourcing policies are traceable to

---

[7] The Students define programs as "unique" to one college or university if they aren't *also* offered at a nearby peer institution. For example, in the Students' view, a program would be "unique" to FAMU if FAMU offers it, but the "geographically proximate" FSU does not. And the Students define "high-demand programs" as ones "that a disproportionately large number of students can be expected to choose as their major field of study." The focus on "unique, high-demand programs" mirrors arguments the parties made, and district court considered, in *Knight*. *See* 14 F.3d at 1543–44 (discussing the presence of "high-demand and high-prestige programs" at Alabama's HWIs and nearby HBCUs). The presence (or lack) of unique, high-demand programming at one institution can be relevant to the program-duplication issue. *See id.* And the Students assert, boosting the unique, high-demand programming at a state's HBCUs might help remedy any enduring segregative effects of the de jure system of separate-and-unequal higher education. *See id.*

the Administrators' past decisions, which they allege discrimination initially motivated in part. *See Knight*, 14 F.3d at 1540. Under the Students' allegations, FAMU has been inequitably treated since its inception. The complaint asserts that FAMU was originally "designated as an 1890 land-grant institution by Florida precisely to maintain de jure segregation." In 1920, FAMU received roughly $25,000, while UF received $146,000 in State appropriations. And by 1945, that over-five-fold gap remained—with UF receiving over $1 million, as compared to FAMU's roughly $200,000. The Students allege that although FAMU "was supposed to be separate and equal," it was in fact "unequal in every way and funded unequally by the Defendants disproportionately to Florida's [H]WIs."

The Students also allege that the Administrators promised, in a 1998 agreement, to equitably fund FAMU, given that they hadn't done so in the past. But, the Students continue, Florida didn't keep those promises.

The Students assert that we can see these alleged disparities in Florida's history of unequal faculty pay, too. They say this underfunding results from the segregative system and works "to FAMU's detriment." It's also, the Students contend, a longstanding effect of *de jure* segregation.

For example, in 1922, FAMU paid its English professors only $800, while UF paid its English professors $2,700. In 1961, when Florida had only three four-year institutions in its university system, UF's average faculty compensation was 33% higher than FAMU's, and FSU's average compensation was 35% higher than

FAMU's.  In 1980, after Florida created more public universities, FAMU ranked ninth out of nine Florida public universities in average pay for full-time professors and associate professors.  It ranked eighth for assistant professors.  At that time, the average salaries for full-time FAMU professors were 14% below the median for all Florida public universities and 24% below UF's average faculty salaries.

As the Students tell it, faculty salaries at FAMU are still among Florida's lowest.  For example, in 2020, out of Florida's twelve public universities, FAMU ranked eleventh for its average full-time-professor salary, twelfth for the average associate-professor salary, and eleventh for assistant professors' average salaries.  According to the Students, "[g]iven the relatively low financial resources [Florida] allocate[s] to FAMU as compared to Florida's [H]WIs, FAMU is less competitive in attracting faculty, which further undermines FAMU's ability to become a premier research institution."

Finally, the Students allege that FAMU's campus facilities are also significantly underfunded.  And they trace these disparities back "to the former de jure system."  The Students claim that when FAMU first opened in 1887, the school shared a building with a Blacks-only high school.  Six years later, FAMU relocated to a former slave plantation—its current location.

The Students submit that as part of the 1998 agreement, Florida "committed to 'ensur[ing] that their HBCUs [were] comparable and competitive with the [H]WIs in all facets of their operations and programs,' including the 'enhancement of campus

environments at HBCUs . . . with respect to the physical character-istics of landscape, ambiance, and appearance as well as the availa-bility, quality, and adequacy of facilities necessary to support the missions and programs of the institutions.'" But from 1998 to 2003, Florida "failed to complete any capital projects for FAMU's Architecture, Business, and Engineering programs," and today "these programs have been awarded few, if any, enhancements at all."

Beyond the general underfunding assertions, the Students also allege that the Administrators have chronically underfunded FAMU by funding it "at a per-student allocation less than Florida [H]WIs," "failing to match FAMU's federal land grant funds at a one-to-one match," and "implementing the PBFM, which relies on metrics skewed by de jure segregative practices . . . ." For example, from 1887 (FAMU's founding) through 1956 (post-*Brown v. Board of Education*), the Students contend that "Florida failed to equally di-vide federal land-grant funds between its two land grant universi-ties, allowing UF to prosper at the expense of FAMU."

The complaint contends that this chronic underfunding and underresourcing through a "lack of investment in FAMU" have "continu[ed] to this day . . . ." For example, on the land-grant-fund-ing issue, the Students assert, Florida has matched FAMU "at an average of 50% or less" "[f]rom 2011 to the present," resulting in a total "withhold[ing]" of $24.4 million in funds for the 2011–22 pe-riod. The Administrators have also appropriated fewer state dol-lars to FAMU than to UF, the Students allege.

The Dissent argues that the disparity in federal fund matching stems from the fact that UF receives funding under the First Morrill Act of 1862 and FAMU receives funding under the Second Morrill Act of 1890. *See* Diss. Op. at 15. As the Dissent explains, the First Morrill Act requires states to match 100% of federal funds, but as of 2002, states can obtain a waiver that allows them to match only 50% of federal funds for Second Morill Act schools. *See id.*

But as our binding precedent explains, if a policy of allocating a disproportionate share of land grant funding "was originally adopted for discriminatory reasons, the *Fordice* test inquires whether the current policy is 'traceable' to the original tainted policy, or is 'rooted' or has its 'antecedents' in that original policy." *Knight*, 14 F.3d at 1550. And here, the Students allege that the First Morrill Act allowed segregated states like Florida to exclude Black citizens from its benefits. So FAMU wasn't created until the Second Morrill Act, which required states to establish separate land-grant institutions for Black students if their First Morrill Act institutions were race-restricted. In other words, Florida funded FAMU under the Second Morrill Act instead of the First because of discriminatory reasons in the first place.

Plus, the Students allege that funding disparities between HWIs and HBCUs persisted, resulting in the United States Office for Civil Rights's 1970 determination that "the State of Florida was operating a racially identifiable higher education system in violation of Title VI of the Civil Rights Act of 1964," and its 1994 Notice to Florida determining that many vestiges of Florida's unlawful

segregation policies and practices remained in practice in Florida in 1994, necessitating a plan outlining Florida's obligations to dismantle these vestiges. Despite that plan, the Students allege, from 1987 to 2020, the per-student state funding appropriation to FAMU was 67.5% of the per-student appropriation to UF.

The Students additionally allege that "FAMU requires more State-allocated funding per student to service its student population, since it lacks economies of scale." So that makes the lesser-funds issue even more significant, the Students urge, in terms of diminished educational opportunities for FAMU students. The Students allege that in the 2018 to 2019 academic year, for instance, FAMU received $10,300 per student from the state, but UF received $14,574 per student.[8] They trace these funding disparities back to FAMU's founding as Florida's "Black" land-grant institution.

The per-student funding isn't all. In addition, the PBFM allegedly allocates funds to universities based on metrics the

---

[8] The Administrators dispute the Students' calculation of the "per-student funding" that the state has allocated to FAMU versus other schools over the years. As their brief notes, though, the Administrators made a number of methodological decisions in reaching the figures they provide—including "omit[ting]" certain kinds of funds that they say "do[] not go to students," and using "full-time equivalents to reflect student enrollment," which they contend is consistent with "the industry standard." While these data and arguments may be appropriate for consideration at a later stage in the case, it's not appropriate to weigh competing "evidence" right now. And again, the complaint alleges to the contrary—that FAMU *does* receive less per-student funding. That's the allegation we must credit at the motion-to-dismiss stage, not whatever the chart in the defendants' brief purports to show.

Students contend are "skewed by de jure segregation, such as retention rates, post-graduation education rates, degree production, affordability, prospective employment and salaries, access rate, 4-year graduation rates for first-in-time college students, 3-year graduation rates for associates and or transfer students, and 6-year graduation rates." The Students argue that this formula perpetuates the historical practice of underfunding FAMU because it ignores the "historical disadvantages and the socioeconomic and racial background of the students [FAMU] predominantly services . . . ." They cite studies finding the use of PBFMs harmful for HBCUs more generally. FAMU reportedly scored the lowest of any of its peers on the PBFM for both 2018 and 2020, meaning it ended up with markedly less funds.

The complaint asserts that because the PBFM increases funds to historically white universities, while decreasing those to HBCUs, in turn, the Administrators' use of this formula "effectively eliminates the black universities as viable choices" for many students. So in the Students' view, this funding policy has its roots in Florida's system of de jure segregation—where the state universities were separate and manifestly unequal. And, they allege, the segregative effects of that system of de jure segregation have continued to this day.

These allegations adequately plead traceability.

The Dissent reasons that the Students cannot allege traceability because the PBFM policy was enacted in 2014 and allocates funding based on purportedly meritocratic and objective standards.

*See* Diss. Op. at 12–15. But whether the PBFM standards are genuinely neutral and disconnected from de jure segregation is one of many disputed questions of fact that this case presents.

It's worth repeating that, at this early stage in the case, the question isn't whether the Administrators have *in fact* been underfunding and underresourcing FAMU in a way that historically traces to Florida's system of de jure segregation in higher education. The question is only whether the Students' allegations overcome the *Twombly/Iqbal* hurdle. And once we accept the Students' well-pled allegations as true, as we must at this stage, the underfunding policies reasonably appear traceable to Florida's historical antecedent practice of underfunding FAMU from its inception. Under the complaint's allegations, that underfunding was "originally adopted for discriminatory reasons"—to maintain FAMU as a purportedly "separate but equal," lesser funded institution relative to its historically white peer institutions. *See Knight*, 14 F.3d at 1550.

Because these policies allegedly find their "historical antecedents" in Florida's de jure system of segregated higher education, the Students do not have to separately allege discriminatory intent to proceed on these claims. *See Fordice*, 505 U.S. at 733 n.8. And the mere fact that some of these policies, like the PBFM, might have had alternative "midpassage justifications" doesn't suffice to cut off traceability, either. *See id.* at 734; *see also Knight*, 14 F.3d at 1550 (stating that "an otherwise legitimate interim justification . . . is insufficient to break the causal chain"). The same is true of the Administrators' land-grant matching counterargument—that it's

justified by Florida's decision to match federal funding only to the extent that federal law requires.

It also doesn't matter that particular policies, like the PBFM, didn't themselves exist during de jure segregation. Mississippi's ACT policy, at issue in *Fordice*, didn't either. Even so, the Court reasoned, it was traceable to earlier policies that tried to hinder Black students' admission to Mississippi's historically white universities, by imposing heightened and racialized admissions standards. *See Fordice*, 505 U.S. at 733–35; *see also id.* at 734 (finding this policy "traceable to the de jure *system*" (emphasis added and italics removed)). What matters is whether the underfunding/underresourcing policies the Students point to are traceable to that *system* of de jure segregation. *See id.* And as the Students allege them, they are.

Second, continuing effects. Many of the same traceability arguments support this second prong, too. The underfunding policies have allegedly contributed to FAMU's difficulties in "attract[ing] a diverse student population" through, for example, having sufficient funds and resources to improve the university's facilities and infrastructure. The funding issues have also allegedly contributed to FAMU's challenges in attracting competitive faculty through offering higher salaries. And, the Students allege, they've contributed to the university's alleged problems with attracting students "of all races," whose decisions to attend the school are impacted by FAMU's underfunding and underresourcing—all part of

a "centuries-long practice of relegating FAMU to a subpar separate and unequal status."

The Students allege that these policies and practices "influenc[e] student enrollment decisions," *Fordice*, 505 U.S. at 731, by restricting prospective students' "choice of which institution to enter," and "contribut[ing] to the racial identifiability of" FAMU and Florida's historically white institutions, respectively, *id.* at 733; *see also Knight*, 14 F.3d at 1541 (stating that segregative effects may include "policies that discourage whites from seeking to attend HBIs," including "the failure to fund HBIs comparably to HWIs"). This satisfies the continuing-effects prong at the pleading stage.

The district court disbelieved the Students' allegations about Florida's historically white institutions as being (as the Students called them) "traditionally white," asserting that in its view, "they are not." As the district court saw things, all Florida's schools actually "have racially diverse faculties and student bodies," and the Students' complaint "does not allege the contrary."

But this statement failed to faithfully apply the motion-to-dismiss standard. *See Twombly*, 550 U.S. at 555–56. It's incorrect to suggest that the Students allege that FAMU is "diverse,"[9] and it

---

[9] To the contrary, the Students repeatedly allege that Florida's "*failed to address disparities*" in terms of recruiting a "racially diverse faculty"; and they allege that Florida's historically white schools are still largely white, and its HBCU is still largely Black, meaning there's both a "lack of racial diversity" among FAMU's faculty and its "student population" Specifically, the Students allege that "[s]tatistics reported by FAMU in the past several years . . . confirm" that FAMU has experienced only "negligible increases, if any at all, in the number

wasn't the district court's job, at this stage, to decide whose version of events to credit. Plus, FAMU's alleged racial statistics are similar to those from the schools at issue in *Knight* and *Fordice*;[10] the mere fact that FAMU isn't literally 100% Black, and the HWIs 100% non-Black, doesn't mean there's no *Fordice* problem. And in any case, the question isn't simply whether the schools are "diverse" or not. It's whether the challenged policies have influenced students' free choices, or contributed to the institutions' racial identifiability. *See* 505 U.S. at 733. Here, the Students adequately pled that they have.

Third, redressability. It's easy to imagine what alternatives or modifications the Administrators could make to remedy the alleged underfunding/underresourcing problem. For one thing,

---

of other-race, especially White, students attending FAMU." And they allege that the PBFM has "result[ed] in less diverse student populations" at UF and FSU relative to "Florida's other public universities."

[10] Though the *Knight* opinion doesn't expressly tell us what the student bodies' racial compositions were, *see generally* 14 F.3d (describing the schools only as "historically white" and "historically black," respectively), the United States's brief reported a similar percentage of Black students for many of Alabama's HWIs as FSU's 9.2% Black statistic (contrasted with FAMU's, which is 83.4% Black). *See* United States's Brief in *Knight*, 1993 WL 13139377, at *23. So we observed that the number of Black students at the HWIs had "remained proportionally quite low," and that "[a] significantly disproportionate share of black Alabamians has continued to attend the [HBIs] . . . and those institutions have attracted relatively few white students." *Id*. at 1539. Given that similar figures worked in *Knight* to establish that the schools remained "racially identifiable," we see no reason to think they shouldn't do the same here. Likewise, the HWIs in *Fordice* had "remained predominantly white, averaging between 80 and 91 percent white students," whereas the HBCUs' "racial composition ranged from 92 to 99 percent black." 505 U.S. at 725.

they could allocate more funds to FAMU, either generally or on a per-student basis. Or they could modify or eliminate the PBFM, which the Students say has "little to no effect on degree completion outcomes," anyway—meaning it may lack a sound educational justification. At the pleading stage, this is enough to show that the Students adequately pled a redressable *Fordice* violation.

The Administrators advance a few counterarguments. None persuade us. They first take issue with a report that the Department of Justice's Office of Civil Rights ("OCR") authored. The report had concluded that many of the same policies the Students challenge in this lawsuit are traceable to segregation, so it directed the Administrators to remedy them. The Administrators contend, correctly, that we shouldn't defer to the report's legal conclusions. *See Loper Bright Enters. v. Raimondo*, 603 U.S. 369 (2024).

But we don't have to look to the OCR report to conclude that the Students have pointed to policies that, as alleged, are traceable to Florida's de jure system of segregation, have continuing segregative effects, and are redressable.

Next, the Administrators urge us not to consider a letter sent by the U.S. Secretaries of Education and Agriculture to Governor Ron DeSantis in September 2023, asking Florida to address the funding gap between FAMU and UF. We don't. We need not consider this letter in assessing whether the Students adequately pled their claims because, as we've explained, their complaint suffices without it.

Finally, the Administrators contend that the challenged policies aren't vestiges of segregation because we should "presum[e]" that states "comply with the Constitution," especially with the passage of time. But neither the *Fordice* nor the *Knight* Courts articulated this "presumption" in the school-desegregation context. And with good reason: no "presumption of legislative good faith," *see League of Women Voters of Fla. Inc. v. Fla. Sec'y of State*, 66 F.4th 905, 923 (11th Cir. 2023), can relieve the state of its "affirmative duty to dismantle [its] prior dual university system," *see Fordice*, 505 U.S. at 727–28; *see also Knight*, 14 F.3d at 1541. After all, when segregative effects can be traced to de jure segregation, the state's present-day intent is irrelevant. Plus, we don't generally apply evidentiary presumptions at the motion-to-dismiss stage—before evidence has been collected.[11]

Here, we conclude that the Students adequately pled a *Fordice* claim on their underfunding/underresourcing allegations.

### 3.   Curricular Policies

Now we turn to the Students' curricular-policy allegations. As we explain below, the Students adequately pled these claims,

---

[11] *See, e.g.*, *Alexander v. S.C. State Conf. of the NAACP*, 602 U.S. 1, 10 (2024) ("This presumption of legislative good faith directs district courts to draw the inference that cuts in the legislature's favor *when confronted with evidence* that could plausibly support multiple conclusions." (emphasis added)); WRIGHT & MILLER, 5B FED. PRAC. & PROC. CIV. § 1357 (4th ed.) ("[C]ourts have refused to consider presumptions in favor of the defendant on a motion to dismiss since presumptions are evidentiary standards that are inappropriate for evaluation at the pleadings stage.").

too, at this stage of the case. We go through each *Fordice* prong in turn.

We begin again with traceability. The Students adequately pled that the challenged curricular policies are traceable to Florida's de jure system of higher education. As the *Fordice* Court observed, it could "hardly be denied" that program duplication "was part and parcel" of the "separate but equal," "dual system of higher education . . . ." 505 U.S. at 738.

The same is true here: the Students allege that FAMU was created to be the so-called "Black School" that Florida needed to "maintain[] [its] 'separate but equal' system of public higher education . . . ." And they assert that FAMU's allegedly persistent unequal programmatic offerings, and the continued duplication of programs at FAMU and FSU, have been a means of "perpetuat[ing] [that] dual and unequal system," from the school's inception through today. So at a high level, the alleged duplication and lack of unique programs at FAMU trace back to Florida's de jure system of segregated higher education. *See Knight*, 14 F.3d at 1550; *Fordice*, 505 U.S. at 729.

More granularly, the Students detail allegations to show *how* the curricular decisions are rooted in de jure segregation. For example, they allege that, for the past several decades, Florida has failed to introduce "new programs," especially "high demand programs that are not offered at geographically proximate FSU[,]" to advance FAMU's distinctive institutional identity. This is especially relevant when, the Students assert, FSU has 174 unique programs

not offered at FAMU, but FAMU has only 34 unique programs not offered at FSU.  Of FSU's 174 total unique programs, ten are unique, high-demand programs not offered at FAMU.  But of FAMU's thirty-four unique programs, only four are unique, high demand programs not offered at FSU.

And "FAMU has *zero* unique, high demand programs at all levels (undergraduate, master's, doctorate) that are not offered at any of Florida's [H]WIs."  According to the Students, adding unique, high-demand programs is important "to advancing a distinctive identity at FAMU" and eliminating "vestiges of segregation."

The Students contend that FAMU's "brand" focuses exclusively on its identity as an HBCU and not *also* as a school strong in any particular programmatic offerings.  As a result, they allege, "the lack of meaningful program uniqueness fails to attract non-Black students to attend FAMU."  And, they continue, we can see that in "[t]he significantly low presence of other-race, especially White students, at FAMU . . . ."

For example, the Students point to the merger with FSU of FAMU's engineering college, which was a high-demand program, and aver that FAMU is no longer as unique; so it allegedly struggles to attract students as a result.  The Students also highlight the decades-long closure and later relocation of FAMU's law school from Tallahassee to Orlando, 260 miles away from FAMU, as evidence of the Administrators' efforts to shutter high-demand programs at FAMU and prevent competition with FSU's law school.

As for duplication of programs, the Students allege that the Administrators made FAMU less attractive "by duplicating its non-core programs" and "merging [the] high demand programs" that it used to have—which are now instead "joint initiatives with FSU." They argue that "FAMU's program offerings are overwhelmingly duplicated by Florida's [historically white institutions] and therefore do not meaningfully distinguish FAMU from" those schools, so as to attract more students to FAMU. And with respect to FSU, in particular, the Students allege that it "unnecessarily duplicates the majority of high demand programs offered at FAMU." And, they argue, that "perpetuate[s] a dual and unequal system of higher education." Specifically, the Students assert that "50 non-core FAMU programs are duplicated at FSU," and the majority of these duplicated programs are also "high demand programs . . . ."

To be sure, as the Administrators rightly point out, even the complaint alleges that FAMU has *some* high-demand, unique programs. But this misunderstands the problem: the issue isn't whether FAMU has any unique, high-demand programs at all. It's whether the relative lack of unique, high-demand programs is traceable to the de jure system and has continuing segregative effects.

Here, the Students adequately allege that the lack of unique, high-demand programs at FAMU is traceable to Florida's de jure system of segregated higher education—concentrating the unique, high-demand programs at its historically white institutions, and offering relatively far fewer at Florida's lone HBCU.

Now onto the continuing-effects prong. As alleged, both these curricular policies have continuing segregative effects. As we've noted, these effects may consist of, for example, discouraging more non-Black students from attending the HBCU, *see Knight*, 14 F.3d at 1546, or otherwise restricting students' "freedom of choice," *see Fordice*, 505 U.S. at 733. The Students allege both here. They assert that FSU offers "five times the number of unique programs" as FAMU. And at the statewide level, FAMU allegedly has "zero unique high demand programs" that aren't offered at any of Florida's historically white institutions. The Students assert that this contributes to FAMU's "racial identity" and hinders students' choices. This aligns precisely with the kinds of continuing effects *Fordice* and *Knight* point to. *See Knight*, 14 F.3d at 1546; *Fordice*, 505 U.S. at 733.

Last, redressability. As for possible alternatives, the complaint proffers that the Administrators can take steps to "ensur[e] that FAMU has a meaningful number of high demand non-core programs that are 'unique' to FAMU (not also offered at, and therefore not duplicated at, geographically proximate and traditionally White FSU)." As alleged, the Administrators can do this by, for example, approving new programs at FAMU, considering modifications to the now-joint FAMU/FSU programs, or increasing funding to FAMU to enhance its extant programming. These alleged harms are redressable. And it doesn't matter that the Students don't point to any particular high-demand program that FAMU's students wanted but don't have. After all, it's going to be the state's burden—not the Students'—to propose any ultimate remedy.

*Knight*, 14 F.3d at 1541.  So the district court erred in faulting the Students for this.[12]

The Students may or may not prevail on this claim later on once the parties put forward evidence.  But that's jumping ahead.  At the motion-to-dismiss stage, the Students have adequately pled their claims under *Twombly*, *Iqbal*, and Rule 8.

So we conclude that the Students sufficiently pled their *Fordice* claim, as it concerns both the alleged underfunding/underresourcing, and the curricular-policy allegations.  In other words, they've adequately pled Count I (their *Fordice*/Title VI claim) and Count II (their *Fordice*/Equal Protection claim).

### D. The Students stated a claim under the Equal Protection Clause.

We also determine that the Students adequately pled their standalone (non-*Fordice*) Equal Protection claim in Count III.

The Equal Protection Clause provides that "[n]o State shall . . . deny to any person within its jurisdiction the equal protection of the laws."  U.S. CONST. amend. XIV, § 1.  "To establish an equal

---

[12] In requiring the Students to do this, the district court effectively replicated the error that the lower court made in *Fordice*.  There, the Supreme Court faulted that district court for "stating that 'there is no proof' that elimination of unnecessary duplication would decrease institutional racial identifiability, affect student choice, and promote educationally sound policies," without making clear "whether it had directed the parties to *develop evidence* on these points, and if so, what that evidence revealed."  505 U.S. at 739 (emphasis added).  So too here: it's simply too early to tell.

protection clause violation, a plaintiff must demonstrate that a challenged action was motivated by an intent to discriminate." *Elston v. Talladega Cnty. Bd. of Educ.*, 997 F.2d 1394, 1406 (11th Cir. 1993). She can establish discriminatory intent "by evidence of such factors as substantial disparate impact, a history of discriminatory official actions, procedural and substantive departures from the norms generally followed by the decision-maker, and discriminatory statements in the legislative or administrative history of the decision." *Id.* (citing *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265 (1977)). These are the "*Arlington Heights*" factors. *See id.*

While the *Arlington Heights* factors are one way of showing discriminatory intent, they are just "some examples" of the kinds of "'evidence' that courts might properly consider" in undertaking this inquiry. *See id.* But they are "not [an] exhaustive" list, and the factors have since been supplemented by the "foreseeability of discriminatory impact, . . . knowledge of discriminatory impact, . . . and . . . the availability of less discriminatory alternatives." *Jean v. Nelson*, 711 F.2d 1455, 1486 (11th Cir. 1983), *on reh'g*, 727 F.2d 957 (11th Cir. 1984), *aff'd*, 472 U.S. 846 (1985) (internal citations omitted).

"Discriminatory intent may be found 'even where the record contains no direct evidence of bad faith, ill will or any evil motive on the part of public officials.'" *Elston*, 997 F.2d at 1406 (quoting *Williams v. City of Dothan*, 745 F.2d 1406, 1414 (11th Cir. 1984)). And the action need not be primarily or dominantly motivated by

a discriminatory purpose. *Jean*, 711 F.2d at 1485. Rather, all plaintiffs must show is "that the action taken was, at least in part, 'because of,' and not merely 'in spite of' its adverse effects upon an identifiable group." *Id.* (citation omitted).

Here, the Students' allegations support the reasonable inference that discriminatory motivations were at play, "at least in part." *See id.* To show this, we'll run through some of the *Arlington Heights* factors. First, the Students allege a "substantial disparate impact," *Elston*, 997 F.2d at 1406, in terms of the per-student and overall funding disparities between FAMU and Florida's historically white institutions. As alleged, these substantial disparities have been around since FAMU's inception and persist today. Second, the Students assert a disparate impact in the programming and curricular offerings between FAMU, Florida's only HBCU, and its historically white peer institutions.

The complaint also reasonably implies the Administrators' knowledge of the foreseeable "discriminatory impact" of their allegedly unequal funding decisions. *See Jean*, 711 F.2d at 1486. After all, the Students allege that the Administrators were repeatedly put on notice of their pattern of chronically underfunding FAMU, and of the fact that this practice potentially violated the Constitution. They were on notice through (1) a 1970 OCR report, (2) a 1978 five-year desegregation plan that the 1970 OCR report prompted, (3) a 1994 notice from the OCR (informing them that these practices remained in place and were potentially violative of the State's affirmative duty to dismantle segregation's vestiges), and (4) the resulting

48                     Opinion of the Court                    24-10567

1998 agreement, in which Florida allegedly affirmatively *acknowledged and agreed to address* these problems—(5) plus, of course, this lawsuit.[13]   *Cf. Pers. Adm'r of Massachusetts v. Feeney*, 442 U.S. 256, 279, n.25 (1979) (observing that "when the adverse consequences of a law upon an identifiable group are . . . inevitable . . . , a strong inference that the adverse effects were desired can reasonably be drawn").[14]

Taken together, these detailed allegations "go to the heart of" many of the *Arlington Heights* factors.  *Cf. Lewis v. Governor of Alabama*, 896 F.3d 1282, 1295 (11th Cir. 2018), *vacated en banc on other grounds*, 944 F.3d 1287 (11th Cir. 2019).[15]  They plausibly imply that discriminatory intent was at play—particularly given the alleged longstanding history of underfunding Florida's HBCU relative to its historically white counterparts.

---

[13] To reiterate, we aren't looking to these OCR reports for their legal conclusions. *See Loper Bright*, 603 U.S. 369.  What matters is that the Students alleged that the OCR reports, as a factual matter, *notified* the Administrators that their conduct may have been resulting in racial disparities.

[14] The Dissent argues that these OCR determinations are not relevant because they are decades old. *See* Diss. Op. at 25.  But the age and consistency of these documents plausibly support allegations that the administrators have known about these problems for decades and have intentionally done nothing to remedy them.

[15] We vacated the panel decision en banc because we found the plaintiffs lacked standing to sue. *See* 944 F.3d at 1292.  Our en banc Court didn't opine on the merits of the Equal Protection claim, though, which the panel had thoughtfully analyzed.

To be sure, after discovery, it may turn out that the state made its funding decisions and curricular decisions for legitimate, race-neutral reasons, as the state argues. But the Students don't have to show that a discriminatory reason was the only, or even the "dominant" motivation—it just has to be one of them. *See Jean*, 711 F.2d at 1485. And in any case, the Students' allegations go beyond the "merely consistent with . . . liability" bar that *Iqbal* sets. *See Chaparro*, 693 F.3d at 1337; *Iqbal*, 556 U.S. at 678.

On this second point, the parties point us to *Doe v. Samford University*, 29 F.4th 675, 701 (11th Cir. 2022). But we don't find that case instructive. Here, unlike there, the Students' complaint does not itself suggest "obvious alternative explanations." *Cf. id.* Although courts can infer "*from the factual allegations in the complaint* obvious alternative explanations," *id.* at 686 (quoting *Am. Dental*, 605 F.3d at 1290) (emphasis added), courts generally cannot look to extrinsic materials provided by the defendants to overcome plaintiffs' well-pled allegations at the motion-to-dismiss stage.[16]

---

[16] Of course, in some cases a district court *can* properly consider materials outside the pleadings at the motion-to-dismiss stage. *See, e.g.*, *Jackson v. City of Atlanta*, 97 F.4th 1343, 1350 (11th Cir. 2024). But such materials generally must be "'(1) central to the plaintiff's claim' and (2) 'the authenticity of the document [must] not [be] challenged.'" *Id.* (quoting *Horsley v. Feldt*, 304 F.3d 1125, 1134 (11th Cir. 2002)). That's not the case here. The Students do question the Administrators' alternative funding statistics, for example. Beyond that, "[t]he district court generally must convert a motion to dismiss into a motion for summary judgment if it considers materials outside the complaint." *Day v. Taylor*, 400 F.3d 1272, 1275–76 (11th Cir. 2005); *see also* Fed. R. Civ. P. 12(b). The district court did not do so here.

Here, some of the so-called "obvious alternative explanations" that the district court relied on weren't reasonably drawn from the Students' complaint at all. For example, the defendants offered differing (relative to the Students) factual accounts of the schools' respective racial statistics or funding allocations. At the pleading stage, courts must assume the truth of "all the allegations in the complaint . . . (even if doubtful in fact)," and judges may not dismiss claims merely based on their "disbelief of [those] factual allegations." *Twombly*, 550 U.S. at 555–56. The district court erred in effectively weighing the factual evidence at the pleading stage and concluding that it disbelieved the Students' allegations, in favor of the view of events that the Administrators proffered.

Simply put, the question of what the Administrators' motives were turns on factual issues that we can't resolve at the motion-to-dismiss stage. *See, e.g.*, *Lewis*, 896 F.3d at 1296. Perhaps the Students will ultimately be able "to sustain their allegations by proof[.]" *Id.* at 1297 (quoting *Gomillion v. Lightfoot*, 364 U.S. 339, 341 (1960). "The *sole* question" at the pleading stage, though, "is whether the allegations entitle [the plaintiffs] to make good on their claim that they are being denied rights under the United States Constitution." *Gomillion*, 364 U.S. at 341 (emphasis added).

So our decision is narrow. At this stage of the case, we hold that the Students adequately pled their *Fordice* claims, as well as their claims under Title VI and the Equal Protection Clause.

### III.    CONCLUSION

For the reasons we've described, the Students have standing to bring their claims.  So we affirm the district court court's judgment in part.  But we conclude that the district court erred in dismissing the Students' *Fordice*, Title VI, and Equal Protection claims.  So we reverse the district court's dismissal on Rule 12(b)(6) grounds and remand for further proceedings.

**AFFIRMED IN PART, REVERSED IN PART, and REMANDED.**

24-10567                 BRANCH, J., Dissenting                 1

BRANCH, Circuit Judge, Dissenting:

Several students at Florida Agricultural and Mechanical University ("FAMU"), a historically black university, brought a putative class action alleging that the Florida State University System's treatment of FAMU violated Title VI, the Equal Protection Clause, and *United States v. Fordice*, 505 U.S. 717 (1992). *Fordice* held that states have a constitutional obligation to "eradicate policies and practices" that are traceable to their de jure segregated "dual school system[s]." 505 U.S. at 728. In 1994, we decided *Knight v. Alabama*, 14 F.3d 1534, 1550 (11th Cir. 1994), which is the only time this Court has evaluated a *Fordice* claim against a state's public school system. Now, more than three decades after *Knight*, this case presents a *Fordice* claim that goes far beyond what our case law has ever supported.

In this appeal, we are asked to decide (1) whether the plaintiffs have standing to bring this action and (2) whether they adequately pleaded their claims. I agree with the Majority's conclusion that the plaintiff-appellants (the "students") have standing. However, for the reasons that follow, I would affirm the district court's findings that the students failed to adequately plead a facially plausible *Fordice* claim based on Florida's alleged inequitable funding policies or curricular policies and that they failed to adequately plead a facially plausible Fourteenth Amendment equal protection claim.

The students' *Fordice* claim based on a theory of inequitable funding cannot succeed because the students focus on discriminatory impact while ignoring the *Fordice* "traceability" requirement.

2                    BRANCH, J., Dissenting                    24-10567

The students leave decades-long gaps in their allegations that sever any traceability between those modern policies and prior de jure segregation.

The students' *Fordice* claim challenging Florida's curricular policies fares no better. While duplicating programs offered at historically black institutions at other public universities can, in certain circumstances, support a *Fordice* claim, program duplication is a necessary practice for every robust statewide university system. The students' allegations are nothing like the *unnecessary* program duplication at issue in *Fordice* and that existed during de jure segregation creating "separate but equal" schools.

Finally, the students' allegations do not support an inference that the defendants enacted funding or curricular policies with discriminatory intent, so they have not stated a viable equal protection claim.

Accordingly, I would affirm the district court's dismissal of the students' *Fordice* and equal protection claims.

## I.    Background[1]

The plaintiffs in this case are six students from FAMU, a historically black university in Tallahassee, Florida. The students brought this putative class action suit in September 2022, naming as defendants the Board of Governors for the State University

---

[1] "Because this appeal is from the dismissal of a complaint, we accept the allegations of the complaint as true." *Darrisaw v. Pa. Higher Educ. Assistance Agency*, 949 F.3d 1302, 1303 (11th Cir. 2020).

24-10567                BRANCH, J., Dissenting                3

System of Florida, individual members of that board, and the State of Florida (collectively, the "defendants"). In the complaint, the students asserted a *Fordice* claim under Title VI of the Civil Rights Act of 1964 and 42 U.S.C. § 1983 and a claim under the Equal Protection Clause of the Fourteenth Amendment.

The students' first theory to support their *Fordice* claim alleged that the defendants' chronic underfunding of FAMU is a vestige of de jure segregation that the defendants have not remedied. The students' allegations start at the inception of Florida's public universities. The University of Florida ("UF") in Gainesville and Florida State University ("FSU") in Tallahassee were the first two public universities in Florida and admitted only white students when they first opened in the 1850s. FAMU opened in 1887 and admitted only black students.

Several decades later, after the Supreme Court's decision in *Brown v. Board of Education*, 347 U.S. 483 (1954), which held that racial segregation in public schools violated the Equal Protection Clause, and the enactment of the 1964 Civil Rights Act, states with de jure segregated schools faced increased litigation. In 1970, the U.S. Department of Education's Office for Civil Rights ("OCR") notified Florida that its public university system was violating Title VI. OCR determined that the source of the violation was, in part, that FAMU was underfunded compared to historically white universities in Florida and that FAMU did not offer unique academic programs. In 1978, OCR approved a five-year plan to address what it saw as vestiges of segregation. In 1994, OCR issued a notice that

revisited that five-year plan and determined that vestiges of segregation still remained.  Then, in 1998, OCR approved a new plan for Florida to reform its public higher education system.  In 2003, Florida issued a report declaring the success of the 1998 five-year plan, to which OCR never responded.

Jumping forward twenty years to the present litigation, the students' complaint alleged that, as part of the OCR reform plans in the 1970s and 1990s, Florida committed to allocating equitable funds to FAMU and to seeking funding to maintain and increase the excellence of FAMU, but the defendants failed to live up to this commitment in three ways.  First, the students alleged that the defendants continued to underfund FAMU compared to historically white universities in Florida.  According to the students, the chronic lack of funding "perpetuates the vestiges of *de jure* segregation."

Second, the students challenged the defendants' Performance Based Funding Model (the "PBFM"), which the defendants implemented in 2014 to allocate funds to Florida's public universities based on each school's retention rates, post-graduation education rates, degree production, affordability, prospective employment and salaries, access rate, and graduation rates.

Third, the students challenged the defendants' decision to match federal funding of FAMU at a lower percentage than it matches federal funding of its other land grant institution.[2]

---

[2] Land grant institutions are colleges or universities originally funded by federal appropriations or the sale of federal public land granted to states through

24-10567                BRANCH, J., Dissenting                    5

According to the complaint, Florida has two public universities that are land grant institutions: UF, which became a land grant institution under an 1862 statute, and FAMU, which became a land grant institution under 1890 legislation. Pursuant to federal legislation, states are required to match 100% of federal land grant funding for 1862 land grant institutions, but waivers allow them to match only 50% of federal land grant funding for 1890 land grant institutions. Since 2011, the defendants have matched 100% of federal land grant funds to UF and 50% of such federal funds to FAMU. The students alleged that the defendants' historic decision to match less than 100% of federal funds to FAMU "significantly disadvantages" FAMU because it is "more reliant on the State's funding than UF" and is an intentional decision that traces back to de jure segregation.

The students' next theory to support their *Fordice* claim challenged FAMU's curricular offerings, asserting that the lack of unique programming at FAMU stems from the defendants' failure to cease unnecessary program duplication at historically white universities and to introduce new unique high demand programming at FAMU. In particular, the students focused on FAMU's law and engineering programs. Turning back to the 1960s, they alleged that the defendants closed FAMU's law school in Tallahassee in 1968 and transferred its assets to FSU to be used for FSU's already-

the First Morrill Act of 1862 or the Second Morrill Act of 1890. *See Knight*, 14 F.3d at 1547 (citing *Knight v. Alabama*, 787 F. Supp. 1030, 1040–46 (N.D. Ala. 1991)).

existing law school in Tallahassee. More than 30 years later, in 2002, FAMU's law school reopened in Orlando, Florida. According to the students, the defendants improperly chose the Orlando location to avoid competing with FSU's law school in Tallahassee.

As for the engineering program, the students look back to the 1980s, alleging that the defendants unnecessarily duplicated FAMU's engineering program in violation of *Fordice* by creating a joint engineering program with FSU in 1982. Under this joint engineering offering, students take undergraduate prerequisite courses at their home school (either FAMU or FSU) but attend advanced courses together in a shared building in Tallahassee. The defendants designated a single budget to fund the joint engineering program. According to the students, engineering was a major focus at FAMU since the school's inception, and it made FAMU unique from historically white schools, like FSU, that did not have an engineering program. By creating the joint program, the defendants allegedly lessened FAMU's ability to attract students to its engineering program, and thus, the students maintain, prevented FAMU from developing a "distinctive 'brand' . . . based on its programmatic offerings rather than on 'race.'"

The defendants moved to dismiss the complaint under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6) for lack of standing and failure to state a claim. The district court found that the students had standing but, upon reaching the merits, determined that they failed to state either a *Fordice* claim under Title VI or § 1983 or a claim under the Equal Protection Clause of the

24-10567　　　　　BRANCH, J., Dissenting　　　　　7

Fourteenth Amendment.  The students appealed, and now we consider whether the district court erred in dismissing each of their claims.

## II.　　Standard of Review

We review a dismissal for failure to state a claim *de novo*.  *Doe v. Samford Univ.*, 29 F.4th 675, 685 (11th Cir. 2022).  A complaint must "state a claim to relief that is plausible," not "mere[ly] possib[le]."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678–79 (2009) (quotations omitted).  To "nudge[] their claims across the line from conceivable to plausible," *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007), plaintiffs must "plead[] factual content"—not "mere conclusory statements"—"allow[ing] the court to draw the reasonable inference that the defendant[s] [are] liable for the misconduct alleged," *Iqbal*, 556 U.S. at 678.

"Factual allegations that are merely consistent with a defendant's liability fall short of being facially plausible."  *Samford Univ.*, 29 F.4th at 685 (quotations omitted).  And when there is an "obvious alternative explanation[]" for a defendant's actions "which suggest[s] lawful conduct," a claim falls short of being plausible.  *Id.* at 686 (quotations omitted); *see also Doe v. Emory Univ.*, 110 F.4th 1254, 1260 (11th Cir. 2024) ("[A]n allegation is 'merely consistent' with liability—and thus legally insufficient—when there is an 'obvious alternative explanation' for the challenged practice 'that suggests lawful conduct.'" (alterations adopted) (quoting *Samford Univ.*, 29 F.4th at 688–89)).  We can infer such

8                    BRANCH, J., Dissenting                    24-10567

obvious alternative explanations "from the factual allegations in the complaint." *Samford Univ.*, 29 F.4th at 686.

### III.    Discussion

The students argue that they plausibly alleged a *Fordice* claim based on the defendants' funding and curricular policies and an equal protection claim based on intentional discrimination. The Majority agrees with the students. I disagree and address the *Fordice* claim before turning to the equal protection claim.

### A.    The students did not sufficiently plead any viable theory for a Fordice claim.

In *United States v. Fordice*, the Supreme Court held that states have a constitutional duty and a duty under Title VI to dismantle "separate but equal" dual school systems that were in place during de jure racial segregation.[3] 505 U.S. at 727–28, 743. Under *Fordice*, "[i]f policies traceable to the *de jure* system [of segregation] are still in force and have discriminatory effects, those policies . . . must be reformed to the extent practicable and consistent with sound educational practices." 505 U.S. at 729. So a successful *Fordice* claim requires that plaintiffs plausibly allege that the policy at issue be "traceable to and thus . . . a vestige of segregation." *Knight*, 14 F.3d at 1550. To determine whether a challenged policy is traceable to a vestige of segregation, we must ask whether it is "rooted in" the

---

[3] Title VI states, in relevant part, that "[n]o person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 42 U.S.C. § 2000d.

prior system of segregation or has its "antecedents" in a policy originally adopted for discriminatory reasons. *Id.*; *Fordice*, 505 U.S. at 730 n.4.

If a plaintiff shows that a policy is traceable to past segregation, the burden of proof shifts to the state "to establish that it has dismantled its prior *de jure* segregated system" or that the state reformed the policy "to the extent practicable and consistent with sound educational practices." *Knight*, 14 F.3d at 1541 (quoting *Fordice*, 505 U.S. at 729, 739). Because the students did not sufficiently allege that any of the defendants' policies were traceable to past segregation, I end my analysis there.

Among the several policies challenged in *Fordice* was the decision of three historically white Mississippi public universities to enact an American College Testing ("ACT") policy in 1963 that required a minimum score for admission. *Fordice*, 505 U.S. at 733–34. The ACT policy was designed specifically to keep black students out of Mississippi's historically white universities. *Id.* While Mississippi explained its ACT policy as a solution for student unpreparedness, the Court determined that such a "midpassage justification" for an originally discriminatory policy did not make the policy "any less constitutionally suspect." *Id.* And *Knight* involved a challenge to Alabama's discretionary decision to direct federal land grant funds to Auburn, a historically white institution, rather than to its historically black institution. 14 F.3d at 1546–47. We determined that Alabama's practice was directly traceable to segregation because it was a continuation of Alabama's segregation-era policy

of allocating nearly all of its federal funds to Auburn, a policy "originally adopted for discriminatory reasons." *Id.* at 1550. The plaintiffs in *Knight* also argued that Alabama unnecessarily duplicated programs offered at its historically black institutions when it created satellite branches of its historically white institutions in the cities where the historically black institutions were already located and allowed the historically white institutions to offer more comprehensive courses. *Id.* at 1542. It was undisputed that such duplication of the historically black institutions' programs was traceable to de jure segregation, and we remanded the case to the district court to conduct the remainder of the *Fordice* inquiry. *Id.* at 1544–46, 1556.

The students here failed to adequately allege that the policies they challenge are traceable to segregation, and therefore they failed to state a facially plausible *Fordice* claim.

### 1. The Funding Policies

The students' *Fordice* claim challenges the defendants' funding policies on three grounds: first, their failure to equitably fund FAMU compared to Florida's historically white universities;[4] second, their use of the PBFM to determine appropriations among Florida's public universities; and third, their decision to match only

---

[4] The students' claim of inequitable funding alleges that general underinvestment in FAMU has resulted in FAMU's low faculty salaries and underfunded or incomplete campus facilities and infrastructure.

50% of FAMU's federal land grant funding when they match 100% of UF's federal land grant funding.

First, the defendants' failure to equitably fund FAMU cannot form the basis of a *Fordice* claim because, while inequitable funding may result from specific policies, it is not a "polic[y] [or] practice[]" itself, as *Fordice* requires. *Fordice*, 505 U.S. at 728; *Ayers v. Fordice*, 111 F.3d 1183, 1223 (5th Cir. 1997). In *Ayers*, the plaintiffs similarly tried to bring a *Fordice* claim challenging "disparities" in funding among Mississippi's public universities. 111 F.3d at 1223. The *Ayers* court declined to evaluate that *Fordice* claim based on funding disparities and looked at the "policies . . . that result in funding disparities rather than . . . the disparities themselves." *Id.* (holding that a formula for allocating funds to public universities was not traceable to de jure segregation). In this case, the students' attempt to support their *Fordice* claim by alleging disparities in funding among Florida's public universities should meet the same fate. Because the students' challenge does not focus on the policies that result in those alleged funding disparities, they failed to state a *Fordice* claim. *See id.*

Second, the students challenge the PBFM approach to funding allocations arguing that it relies on metrics skewed by de jure segregation, which results in less money being allocated to FAMU than historically white universities in Florida. The Majority concludes that the students sufficiently pleaded that the PBFM is traceable to prior de jure segregation. I disagree. The students did not sufficiently allege that the PBFM is traceable to de jure segregation

and their allegations show an obvious alternative explanation for the PBFM.

I start with the lack of traceability. According to the complaint, in 2014, Florida began using the PBFM to allocate appropriations to public universities and colleges. The PBFM awards funding based on objective metrics like retention rates, affordability, prospective employment and salaries, and graduation rates. The students alleged that the PBFM's system of performance-based metrics is "traceable to *de jure* segregation because it perpetuates the same cycle from the *de jure* era of underfunding FAMU," "ignores the significant historical disadvantages FAMU students faced" under the prior segregated system, and does not account for the different "socioeconomic and racial background[s] of the students [FAMU] predominantly serves, which results in lower performance results" by its students when compared to the results of traditionally white universities.

Although the students alleged present discriminatory effects from the PBFM, they fail to connect the PBFM, which was enacted in 2014, back to a prior system of de jure segregation. The students did not allege that the metrics themselves trace back to decisions made during segregation. Instead, they alleged that FAMU receives less funding under the PBFM because of the "historical disadvantages and the socioeconomic and racial background" of FAMU students, "which results in lower performance results for the [PBFM] metrics." So the students alleged only that FAMU receives less funding under the PBFM given the *effects* of prior

24-10567                BRANCH, J., Dissenting                13

segregation. Alleging inequitable present effects of a policy, without more, is not enough to show that it was "rooted in" segregation because a policy's present effects alone cannot show that a policy "has its 'antecedents' in [an] original policy" that was "tainted" by segregation. *See Knight*, 14 F.3d at 1550 (holding that a *Fordice* claim must show that a challenged policy is rooted or has its antecedents in a policy originally adopted for discriminatory reasons).

Relying on *Fordice*'s discussion of Mississippi's ACT policy, the Majority concludes that it does not matter that the PBFM did not exist during de jure segregation. Rather, the Majority concludes that all that matters, at this stage, is that the PBFM allegedly finds its historical antecedents in Florida's de jure system of segregated higher education. The Majority also rejects any explanation for why the PBFM is not traceable to segregation by describing such explanations as impermissible "midpassage justifications" that cannot sever the PBFM's traceability to segregation. I disagree with the Majority because the PBFM is meaningfully different from the ACT college entrance exam policy the *Fordice* Court found to be traceable to de jure segregation. *See Fordice*, 505 U.S. at 734–35. Mississippi provided a "midpassage justification"—solving student unpreparedness—for an originally discriminatory ACT policy, which did not make the policy "any less constitutionally suspect." *Id.*; *see also Knight*, 14 F.3d at 1550 (explaining that a "legitimate interim justification" is insufficient to destroy traceability). Unlike Mississippi's ACT policy, the students in this case did not allege that the PBFM's metrics trace back to segregation decisions. At most, the students alleged that the PBFM's metrics have a present

discriminatory effect because historically black colleges like FAMU underperform on those same metrics when compared to historically white colleges.  Even assuming the students are correct that the PBFM results in inequitable funding, a present discriminatory effect without a link to past de jure segregation is insufficient to adequately plead a *Fordice* claim.  *See Knight*, 14 F.3d at 1550.

Also—and critically at the motion to dismiss stage—none of the students' allegations contend with the obvious alternative explanation that the PBFM policy aimed to limit racial discrimination by relying on purely meritocratic and objective standards to allocate funds among public universities in Florida.  Given this obvious alternative non-discriminatory explanation, I agree with the district court that the students' complaint "stop[s] short of the line between possibility and plausibility."  *Emory Univ.*, 110 F.4th at 1260 ("[A]n allegation is merely consistent with liability—and thus legally insufficient—when there is an obvious alternative explanation for the challenged practice that suggests lawful conduct." (alterations adopted) (quotations omitted)); *Samford Univ.*, 29 F.4th at 686 (holding that in determining facial plausibility for a motion to dismiss, "courts may infer from the factual allegations in the complaint obvious alternative explanations, which suggest lawful conduct").

Third, the students challenged the defendants' decision to match 50% of FAMU's federal land grant funds while matching 100% of federal funds for its other land grant institution.  Again, the students' allegations are insufficient to show that the defendants'

24-10567                BRANCH, J., Dissenting                15

matching policies are traceable to de jure segregation and fall short of being facially plausible.

I start again with the lack of traceability. The students alleged that Florida has two public universities that receive federal land grant funds. UF receives funding from the First Morrill Act of 1862, and FAMU from the Second Morrill Act of 1890. The First Morrill Act requires states to match 100% of federal funds, but as of 2002, states can obtain a waiver that allows them to match only 50% of federal funds for Second Morrill Act schools. *See* Farm Security and Rural Investment Act of 2002, Pub. L. No. 107-171 § 7212, 116 Stat. 134, 447 (codified at 7 U.S.C. § 3222d(d)); 7 C.F.R. § 3419.3(a). So, Florida can receive full federal funding for FAMU by matching federal funds at 50% while it *must* match at 100% to receive federal funding for UF.

The students alleged that since 2011, the defendants matched 50% of federal funds to FAMU and 100% to UF. The students alleged this statutorily permissible disparity is traceable to de jure segregation.[5] But they did not allege facts that can show the modern matching decisions are rooted in segregation-era matching decisions. The students alleged that the outcomes of this funding policy are inequitable, but mere inequity is not enough to state a *Fordice* claim. *See Knight*, 14 F.3d at 1550.

---

[5] The students acknowledge that federal legislation permits the defendants to match 50% of FAMU's federal land grant funding.

To begin, the students point to allegedly discriminatory matching decisions beginning in 2011, but they make no allegations regarding the defendants' fund-matching decisions before 2011, ignoring the decades between de jure segregation and 2011. To support a *Fordice* claim, the students must allege that the defendants' fund-matching decisions are rooted in de jure segregation, but their allegations leave an unexplained gap of several decades between de jure segregation and the defendants' decision to match 50% of federal funds to FAMU in 2011. This unexplained several-decades gap in the students' allegations severs any traceability between the defendants' fund-matching and prior segregation, dooming their *Fordice* claim.

Additionally, the defendants argue that the district court correctly accepted their obvious alternative explanation for their actions—fiscal responsibility. The clear inference based on the facts alleged is that the defendants chose to minimize their own costs—permissibly under federal law—while ensuring the maximum amount of federal funding for Florida's two land grant universities. Because there is an obvious alternative explanation for the defendants' policy that suggests lawful conduct, the students' claim falls short of being plausible and cannot survive a motion to dismiss. *Samford Univ.*, 29 F.4th at 686.

The Majority resists any claim by the defendants of fiscal responsibility, asserting that, pursuant to *Fordice*, a "midpassage justification" for the defendants' fund-matching decisions does not sever the traceability of those decisions to prior segregation. But

fiscal responsibility is not a "midpassage justification." The *Fordice* Court held that a "midpassage justification" for the ACT policy that was enacted in 1963 for an expressly discriminatory purpose and *continued* until at least 1992, when *Fordice* was issued, could not sever traceability. *Fordice*, 505 U.S. at 734. But decades separate the land grant matching decisions in this case from segregation, so fiscal responsibility is not a "midpassage justification" of a continuing segregation-era policy—it is an obvious explanation for a modern policy.

While the students compare the defendants' funding decisions to the land grant funding decision we held was traceable to segregation in *Knight*, 14 F.3d at 1550–51, the facts in that case were far different from the students' allegations here. In *Knight*, Alabama directed federal land grant funds to Auburn, a historically white institution, rather than to its historically black institution as a continuation of its segregation-era policy of inequitably allocating federal funds, which was "originally adopted for discriminatory reasons." *Id.* at 1550. In contrast, the defendants in this case ensure that FAMU receives all the federal land grant funding that is available to it and match 50% of that funding. Although the students asserted that the defendants' decision to match only 50% as opposed to 100% of federal funding is a discriminatory policy, they failed to allege facts showing that the decision has any link to de jure segregation.

Given the factual differences between this case and the funding policies in *Knight* and the obvious alternative explanation that

the defendants acted to secure federal funds while minimizing costs, there is no basis to find that the modern matching decisions are traceable to segregation-era policies.  The *Fordice* claim fails.

### 2.  The Curricular Policies

The students challenged the defendants' curricular policies under *Fordice* by alleging (1) that the curriculum unnecessarily duplicates FAMU's nonessential programs at historically white public universities in Florida and (2) that the curriculum does not provide unique, high-demand programs at FAMU, using the engineering and law programs as examples and comparing FAMU and FSU's curricular offerings.[6]  But the complaint does not contain sufficient facts to state a viable *Fordice* claim under these theories.

I start with the students' allegations of unnecessary program duplication.  A viable *Fordice* claim requires showing more than curricular offerings at a historically black institution that were duplicated at a historically white institution; the duplication must also

---

[6] The students argue that unnecessary program duplication occurs "where two or more institutions offer the same nonessential or noncore program," so "all duplication at the bachelor's level of non-basic liberal arts and sciences course work and all duplication at the master's level and above" qualify as unnecessary (quoting *Fordice*, 505 U.S. at 738).  But the *Fordice* Court did not adopt that standard—it merely noted that the district court used that standard. *Fordice*, 505 U.S. at 738.  Accordingly, I decline to apply it here.

The students also argue that unnecessary program duplication is *per se* traceable to de jure segregation, but that rule is not supported by *Fordice*, *Knight*, or any other binding authority.

24-10567                BRANCH, J., Dissenting                19

be "unnecessary" and, like all *Fordice* claims, traceable to de jure segregation. *Fordice*, 505 U.S. at 729, 738–39.

While the students alleged program duplication at other public universities in Florida, specifically at neighboring FSU, their allegations that program duplication between FAMU and FSU is unnecessary are conclusory and need not be accepted at the motion to dismiss stage. *See Iqbal*, 556 U.S. at 678. The students did not, for example, allege facts that show any particular duplicated programs are unnecessary because there is not enough demand from the FAMU and FSU student bodies to warrant two duplicate programs in the same academic field. Because the students make only conclusory allegations of *unnecessary* program duplication, they have not adequately alleged program duplication between FAMU and FSU that is traceable to the de jure segregation practice of unnecessary program duplication.

Further, the defendants present several obvious lawful alternative explanations for the alleged program duplication, each of which can be inferred from the facts in the complaint. *See Emory Univ.*, 110 F.4th at 1263 ("[A]n allegation is merely consistent with liability—and thus legally insufficient—when there is an obvious alternative explanation for the challenged practice that suggests lawful conduct." (alterations adopted) (quotations omitted)). One obvious alternative explanation for the modern curricular policies is that Florida's population has grown over the decades since segregation, requiring more program duplication across the state's public universities to provide the same access to education.

Another obvious explanation is that Florida has created a robust public university system with 12 institutions that serve different regions within the state, which also requires more program duplication. Yet another obvious alternative explanation is that the defendants see merit in operating neighboring FAMU and FSU as separate full-service research institutions because each school provides unique benefits and experiences. Historically black institutions "have succeeded in part because of their distinctive histories and traditions," *Fordice*, 505 U.S. at 748 (Thomas, J., concurring), and maintaining their existence and comprehensive offerings necessarily requires more program duplication within a state university system. These alternative explanations lead to an inference that *necessary* program duplication exists in Florida, which is distinct from, not rooted in, the segregation-era policies of *unnecessary* program duplication. Given these obvious alternative non-discriminatory explanations, the students' complaint "stop[s] short of the line between possibility and plausibility." *See Emory Univ.*, 110 F.4th at 1263 (quotations omitted). Granting the motion to dismiss was appropriate.

Now I turn to the students' contention that FAMU's curriculum does not provide unique, high-demand programs. I will first address the students' allegations concerning FAMU's engineering program, then turn to their allegations regarding FAMU's law school, before finally analyzing the students' comparison between FAMU and FSU. To the extent the Majority concludes that the students' allegations regarding the merger of FAMU and FSU's engineering programs can support a *Fordice* claim based on

unnecessary duplication of programs, that argument defies logic. The 1982 engineering program merger, as alleged, is not traceable to de jure segregation. A *Fordice* claim requires showing that a modern policy is a vestige of segregation. But the joint engineering program between FAMU and FSU that the students describe is the exact opposite of segregation: it is an example of educational integration. Under this program, the joint college of engineering allows students to study side by side as classmates in a shared building with a shared budget. It would be absurd to permit an inference that a program like FAMU and FSU's joint engineering school—which, based on the alleged facts, promotes collaboration and shared resources—is rooted in segregation. *See Fordice*, 505 U.S. at 738–39 (holding that unnecessary program duplication can support a *Fordice* claim because it is a continuation of the "separate but equal" dual system of education that existed during de jure segregation).

Similarly, the defendants' closure, reopening, and relocation of FAMU's law school cannot support a *Fordice* claim. The alleged facts (that the defendants relocated FAMU's law school to Orlando in a different part of the state than FSU's law school in Tallahassee) in this case are easily contrasted with the segregation-era practice at issue in *Knight* where program duplication between "geographically proximate" institutions supported a *Fordice* claim. *Knight*, 14 F.3d at 1539.

Unnecessary program duplication can create a *Fordice* claim when it is traceable to the segregation-era practice of having

geographically proximate schools with the same curricular offerings. *See Knight*, 14 F.3d at 1543–46. In those instances, the lack of unique programs impedes each school's ability to attract a diverse student body. *Id.* at 1541. The concern that program duplication will prevent attracting diverse students is alleviated, however, when, like here, schools serve different geographical regions. FAMU's law school opened in 1949 in Tallahassee but closed in 1968. At that time, the defendants transferred the assets of FAMU's law school to FSU to be used for FSU's already-existing law school. In 2002, however, the defendants reopened FAMU's law school in Orlando. According to the complaint, the defendants chose Orlando to avoid competition with FSU's law school in Tallahassee. The students asserted in a conclusory manner that the closure of the law school and its subsequent reopening in Orlando 34 years later are traceable to de jure segregation. The students did not allege any facts in the decades intervening the law school's closure and reopening that connect the relocation of FAMU's law school to de jure segregation.

Further, in this case, the defendants' reopening of FAMU's law school was not a vestige of segregation; it was a remedy to the prior closure of the school. And as the students themselves alleged, the defendants' motivation for relocating FAMU's law school was to *avoid* the duplication of law schools in Tallahassee. In Orlando, FAMU's law school would be better situated to attract a diverse student body by operating in a different city and thus to build a reputation beyond its racial history. The reopening of FAMU's law school cannot serve as the basis for a *Fordice* claim because rather

than furthering segregation-era policies, it serves to mitigate the effect of segregation-era policies by relocating FAMU's law school to a different city hundreds of miles from FSU's law school. Accordingly, the students have not adequately alleged that the relocation of the law school can be traced to de jure segregation.

The Majority holds that the students stated a *Fordice* claim when they alleged that FSU has more unique, high demand programs that are not offered at FAMU than the number of unique, high demand programs FAMU has that are not offered at FSU. Here, the students alleged that FAMU has four unique, high demand programs that are not offered at FSU, while FSU has 10 unique, high demand programs not offered at FAMU. As an initial matter, the Majority concedes that our analysis in *Knight* did not discuss the number of unique, high demand programs at the relevant historically black and historically white universities. And *Knight* certainly did not require state university systems to perfectly match the number of unique, high-demand programs offered at its historically black universities to those offered at each of its historically white universities.[7] *See id.* at 1542–46. Without any link to a de jure segregation policy, the students' *Fordice* claim based on the mere difference between the number of unique, high demand

---

[7] In *Knight*, the defendants conceded that the historically black universities' limited educational missions were traceable to de jure segregation. 14 F.3d at 1544. But nothing in this case resembles the limited missions at issue in *Knight*. According to the students, FAMU's mission is to operate as a "doctoral/research institution devoted to student success at the undergraduate, graduate, doctoral and professional levels."

programs offered at FAMU and FSU necessarily fails. *See id.* at 1550 (holding that a challenged policy must be a "vestige of segregation" to support a *Fordice* claim).

### B.    The students failed to state a claim under the Equal Protection Clause.

The Majority concludes that the students adequately pleaded an equal protection claim because their allegations—of disparate impact—permit a plausible inference that the defendants made funding and curricular decisions with discriminatory intent. I disagree because the students rely solely on conclusory allegations and decades-old OCR communications to attempt to show the defendants' discriminatory intent in their funding and curricular decisions.

To adequately plead a claim for a violation of the Equal Protection Clause of the Fourteenth Amendment,[8] plaintiffs must allege facts showing an intent to discriminate, not just discriminatory impact. *See Elston v. Talladega Cnty. Bd. of Educ.*, 997 F.2d 1394, 1406 (11th Cir. 1993) ("To establish an equal protection clause violation, a plaintiff must demonstrate that a challenged action was motivated by an intent to discriminate."); *Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265–66 (1977) (holding that "discriminatory intent . . . is required to show a violation of the Equal Protection Clause" and "impact alone is not determinative"). The

---

[8] The Equal Protection Clause states that "[n]o State shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1.

24-10567                BRANCH, J., Dissenting                25

Majority is wrong that the students adequately pleaded discriminatory intent.

The relevant factors for determining whether a policy was motivated by discriminatory intent include, but are not limited to

> (1) the impact of the challenged law; (2) the historical background; (3) the specific sequence of events leading up to its passage; (4) procedural and substantive departures; . . . (5) the contemporary statements and actions of key legislators . . . . (6) the foreseeability of the disparate impact; (7) knowledge of that impact, and (8) the availability of less discriminatory alternatives.

*Greater Birmingham Ministries v. Sec'y of State for Ala.*, 992 F.3d 1299, 1322 (11th Cir. 2021). Discriminatory intent "implies more than . . . intent as awareness of consequences. It implies that the decisionmaker . . . selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group."[9] *Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 279 (1979) (citation omitted).

To attempt to show discriminatory intent, the students rely solely on OCR determinations made between 1970 and 1998—more than 20 years ago—that FAMU was underfunded and lacked

---

[9] Courts use the terms "discriminatory intent" and "discriminatory purpose" interchangeably. *See, e.g.*, *Arlington Heights*, 429 U.S. at 265; *Johnson v. Governor of State of Fla.*, 405 F.3d 1214, 1223 (11th Cir. 2005) (quoting *Hunter v. Underwood*, 471 U.S. 222, 227–28 (1985)).

unique curricular offerings, which purportedly put the defendants on notice that their current actions violated the Constitution. But those are examples of decades-old notices of discriminatory impact (not intent); without more, they are legally insufficient to show that the defendants acted with discriminatory intent with respect to the modern policies that are the basis of the claims in this case. *See Greater Birmingham Ministries*, 992 F.3d at 1323 (rejecting an inference of discriminatory intent when a legislator's overt prior discrimination lacked a connection to show he acted with discriminatory intent in passing the specific law at issue). And there is no more. The complaint is devoid of factual allegations that could create a connection between the racially disparate impact of the decades-old policies described in OCR's findings and the modern funding and curricular policies at issue here. In fact, the relevant allegations took place years before the challenged funding and curricular decisions—the students do not rely on any allegations after 1998 that can show the defendants' discriminatory intent. Apart from these stale and disconnected OCR findings, the students alleged no specific sequence of events leading up to the funding or curriculum policies that can create an inference of discriminatory intent. Without more, the students have not properly pleaded an equal protection claim.

Ultimately, the Majority, pointing to some of the factors from *Greater Birmingham Ministries*, infers discriminatory intent because the defendants had knowledge of a foreseeable future discriminatory impact of their modern policies based on OCR's decades-old notice of discriminatory impacts that existed between

24-10567                BRANCH, J., Dissenting                27

1970 and 1998. Even if that inference were supported by the students' allegations, the students have not adequately pleaded discriminatory intent because discriminatory intent requires showing more than "intent as awareness of consequences." *Pers. Adm'r of Mass.*, 442 U.S. at 279. The Majority does not, and cannot, rely on anything beyond an inference that the defendants were aware that certain policies may have inequitable consequences. A foreseeable discriminatory impact is not enough to show that the defendants acted with discriminatory intent. *Id.*

Because there is no basis to infer the defendants acted with a discriminatory intent, the students did not plead a viable equal protection claim.

## IV.    Conclusion

Because the policies at issue in this case are not traceable to a prior system of de jure segregation and the allegations in the complaint do not permit a reasonable inference that the defendants acted with discriminatory intent, I would affirm the district court's order dismissing the complaint for failure to state a claim. I respectfully dissent.